1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**GEARINGER LAW GROUP**
825 VAN NESS AVENUE, 4TH FLOOR
SAN FRANCISCO, CALIFORNIA
94109-7847
Tel. (415) 440-3102

BRIAN GEARINGER (State Bar #146125)
R. STEPHEN M. LAROE (State Bar #245269)

**LAW OFFICES OF CASPER,
MEADOWS, SCHWARTZ & COOK**

2121 N. CALIFORNIA BLVD., SUITE 1020
WALNUT CREEK, CALIFORNIA
94596-7333
Tel. (925) 947-1147

ANDREW C. SCHWARTZ (State Bar #64578)

Attorneys for Plaintiff HASAN ARDA AKSU

FILED

AUG 1 3 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

HASAN ARDA AKSU,

           Plaintiff,

           v.

COUNTY OF CONTRA COSTA,
SUZANNE PORTER, TERRENCE
THOMPSON, CHRISTOPHER BUTLER,
BENNY CHETCUTI, JR., STEPHEN
TANABE, SHERIFF DAVID LIVINGSTON
and DOES ONE to FIFTY, inclusive.

           Defendants.

Case No. **CV 12 4268 DMR**

**COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL RIGHTS AND OTHER WRONGS**

**JURY TRIAL DEMANDED**

Date Action Filed:
Trial Date: Not set.

      Hasan Arda Aksu ("Plaintiff") complains of Defendants, and each of them, and alleges that:

/ / /

/ / /

/ / /

COMPLAINT FOR DAMAGES; JURY DEMANDED       1        U.S. DISTRICT COURT CASE NO.

## I.   JURISDICTION AND VENUE

1.     The Court has jurisdiction to grant the relief requested herein pursuant to the Civil Rights Acts, 42 U.S.C. §1983, *et seq*, the Judicial Code, 28 U.S.C. §§1331, 1343 and 2201, the constitutions of the United States and State of California, Cal. Govt. Code §815.2, and California common law.

2.     Venue in this Court is proper because the acts complained of occurred in the Northern District of California, and all parties live, work or are situated in or around the County of Contra Costa, California.

## II.   PARTIES

3.     Plaintiff earned his Ph.D. in 1989 at Northeastern University in Boston, MA and became a U.S. Citizen in 2004. He is the author of over 30 scientific and technical publications and is the recipient of 4 US patents. At all relevant times, Plaintiff lived within the jurisdiction of the Federal Northern District of California.

4.     At all relevant times, Defendant Suzanne Porter ("Mrs. Porter") (1) lived within the jurisdiction of the Federal Northern District of California, (2) was the wife of Plaintiff, (3) was the mother of Plaintiff's child, and (4) acted under color of state law. Plaintiff and Ms. Porter were married in May, 2001, separated in July 2006 and their divorce was made final in November, 2007. They have one minor child.

5.     At all relevant times, Defendant Terrence Thompson ("Mr. Thompson") (1) lived within the jurisdiction of the Federal Northern District of California, (2) was the father in law of Plaintiff and (3) acted under color of state law.

6.     Plaintiff is informed, believes and thereupon alleges that: Defendant Christopher Butler ("Private Investigator Butler") is, and at all times mentioned herein was, (1) a resident of Concord, California, (2) a "Private Patrol Operator" licensed by the State of California Bureau of Security and Investigative Services and (3) acted under color of state law. Private Investigator Butler's license number 14798 was issued on February 26, 2003 and became delinquent on February 28, 2011. Private Investigator Butler operated a business entitled "Christopher B. Butler Investigations" doing business as "Butler & Associates Private Investigations" in Walnut

Creek, California. Private Investigator Butler was a sworn peace officer of the City of Antioch Police Department. Private Investigator Butler has been indicted by the United States for a variety of federal crimes.

7. Plaintiff is informed, believes and thereupon alleges that: Defendant Benny Chetcuti, Jr. ("Mr. Chetcuti") is, and at all times mentioned herein was, (1) a resident of Walnut Creek, California, (2) the brother-in-law of Private Investigator Butler, (3) the agent and/or accomplice of Private Investigator Butler and (4) acted under color of state law.

8. Plaintiff is informed, believes and thereupon alleges that: Defendant Contra Costa County Sheriff's Office Deputy Stephen Tanabe ("Deputy Tanabe") is, and at all times mentioned herein was, (1) a resident of Alamo, California, (2) a sworn peace officer, (3) an employee of the Contra Costa County Sheriff's Office, and (4) acted under color of state law. Deputy Tanabe is sued in both his official capacity and in his individual capacity. Deputy Tanabe has been indicted by the United States for a variety of federal crimes.

9. Defendant Sheriff David Livingston ("Sheriff Livingston") is, and at all times mentioned herein was, employed as the sheriff of Defendant County of Contra Costa, acting within the course and scope of his employment, and under the color of state law. Sheriff Livingston is sued both in his individual and official capacities.

10. Defendant County of Contra Costa ("County") is, and at all times mentioned herein was, a public entity duly organized and existing under the laws of the State of California. The County operates the Contra Costa County Office of the Sheriff ("Sheriff's Office").

11. Plaintiff is ignorant of the true names and capacities of the defendants sued in this litigation as Does One through Fifty, inclusive and, as a result, sues these defendants by these fictitious names. Plaintiff will amend this Complaint to allege the true names and capacities of these defendants once they have been ascertained. Plaintiff is informed, believes and thereupon alleges that each of the fictitiously named defendants: (1) is in some manner responsible for the injuries and damages to Plaintiff alleged in this Complaint and (2) acted under color of state law.

12. Plaintiff is informed, believes and thereupon alleges that at all times relevant to this litigation, Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti,

1  Deputy Tanabe, County, and Does One through Fifty, and each of them, were the agents,
2  servants, and employees of their codefendants, and that these defendants, in doing the things
3  mentioned in this Complaint, were acting within the course and scope of their authority as such
4  agents, servants, and employees, and were acting with the permission and consent of their
5  codefendants.

6        13.    The individual defendants carried out the actions complained of in their individual
7  capacities, under color of state law, and/or in the course and scope of their employment as
8  employees of the County. The County is obligated, under Cal. Government Code, §§815.2 and
9  825(a), to pay any compensatory damages awarded against some or all of the individual
10 defendants. Nevertheless, all Defendants are jointly and severally liable for any damage awards.

## III.    STATEMENT OF FACTS

### A.    Ms. Porter an Mr. Thompson Hire Private Investigator Butler to Setup Plaintiff for a "Dirty DUI"

14      Plaintiff filed for dissolution of marriage from Ms. Porter on October 25, 2006.
They shared custody of their child and Plaintiff is informed, believes and thereupon alleges that:
Ms. Porter hired Private Investigator Butler to entrap Plaintiff by having him arrested on January
9, 2011 for driving under the influence of an alcoholic beverage in order to obtain an advantage
over Plaintiff in obtaining greater custody of their child. A custody evaluator was requested and
appointed by the County of Contra Costa Superior Court later that same month. In the years after
their separation, both parties were granted temporary restraining orders ("TRO") for incidents
which occurred during child custody exchanges and in September, 2009 they stipulated to a non-
CLETS mutual restraining order. Most recently, Plaintiff was granted a permanent restraining
order ("PRO") against Ms. Porter by order of the County of Contra Costa Superior Court on May
31, 2012 based upon incidents of domestic violence on Plaintiff that occurred between June 8,
2009 and the January 9, 2011 Dirty DUI at issue here (which is discussed at PRO pp. 8-9). A true
and correct copy is attached as Exhibit A.

15      Following the issuance of a TRO on October 29, 2010, Ms. Porter initiated the
setup for Mr. Aksu's Dirty DUI. Specifically, Plaintiff is informed, believes and thereupon

alleges that: in or around the first week of November, 2010, Ms. Porter and Mr. Thompson came to Private Investigator Butler's office located at 1000 Detroit Avenue, Concord, CA 94581. Ms. Porter met with Private Investigator Butler and Carl Marino ("Mr. Marino") in order to arrange to have Plaintiff set up for a DUI arrest. Further, Ms. Porter entered into a "Client Service Agreement" ("Agreement") with Mr. Butler and that Mr. Thompson paid a retainer fee in the amount of $1,500 for Mr. Butler's services.

16.   Plaintiff is informed and believes that at their first meeting in November, Mr. Butler told Ms. Porter that normally he would set up a Dirty DUI by arranging younger attractive women as decoys to invite the person to go to a bar or restaurant and have drinks. The decoys then encourage that person to drive and Butler would tip off a law enforcement official if Plaintiff attempted to drive his vehicle following the ruse. Private Investigator Butler referred to this practice as a "Dirty DUI." Plaintiff is informed, believes and thereupon alleges that Private Investigator Butler previously had arranged for the Dirty DUI of David Dutcher in 2008 and subsequently arranged for the Dirty DUI Mitchell Katz, on January 14, 2011 (just 5 days after the arrest at issue here).

17.   Ms. Porter agreed to hire Mr. Butler and Mr. Thompson paid him. But Ms. Porter told Mr. Butler and Mr. Marino that using young women would not work to trick Plaintiff, so instead, they devised a plan to use Mr. Marino, disguised as "John Brownell", to meet with Plaintiff under the guise of doing a report on influential immigrants from the East Bay for Diablo Magazine. Other than the nature of the decoy, the rest of the plan remained the same.

18.   Plaintiff is informed, believes and thereupon alleges that: Mr. Marino is, and at all times mentioned herein was, an employee of Christopher B. Butler Investigations and/or the agent of Private Investigator Butler. Mr. Marino is a "San Francisco Bay Area model/actor" who is "from New York originally." (See www.carlmarino.net). Further, Mr. Marino was a deputy sheriff in Monroe County, New York from 1991 through 2008.

19.   Plaintiff is informed, believes and thereupon alleges that: Mr. Marino postponed setting a meeting with Plaintiff because he was concerned about illegal activities of Chris Butler. Specifically, beginning in late 2010, Mr. Marino contacted law enforcement agents regarding

illegal activities of Private Investigator Butler, among others. Eventually, a representative of the State of California Department of Justice contacted Mr. Marino and requested that he act as a confidential informant regarding the illegal activities of Private Investigator Butler, among others, to which Mr. Marino agreed. By that time, Mr. Marino was acting as a confidential informant. At all times thereafter, Mr. Marino remained a confidential informant until law enforcement officials arrested Mr. Butler on February 16, 2011.

20.     In the meantime, Ms. Porter met with Mr. Butler and Mr. Marino in early January, 2011 and provided them with information about Plaintiff to facilitate the setup for the Dirty DUI. Specifically, she provided Mr. Butler and Mr. Marino with a document that contained a general description of Plaintiff, the vehicles he drove, the license plate numbers, and a suggestion that they meet Plaintiff at "The Vine" located at 480 Hartz Avenue, Danville, California

### B.     The Setup for a "Dirty DUI"

21.     Plaintiff is informed and believes that the plan made by Mr. Butler, Ms. Porter and Mr. Thompson was executed on Sunday, January 9, 2011, at The Vine where Plaintiff met to discuss the Diablo Magazine article with Mr. Marino, still disguised as "John Brownell", and Mr. Chetcuti, disguised as a fellow interviewee for the article.

22.     Over the course of approximately three hours, Plaintiff proceeded to discuss his career and Mr. Chetcuti ordered flights of wine for Plaintiff. Plaintiff ended up consuming more alcohol than he otherwise would have knowingly consumed on this occasion. Mr. Chetcuti encouraged Plaintiff to consume alcohol and Plaintiff is informed and believes that Mr. Chetcuti paid for the alcohol using money given to him by Mr. Butler. Plaintiff asked that food be ordered and Mr. Chetcuti obliged him by ordering some appetizers which they all consumed.

23.     Plaintiff is informed and believes that as he was leaving The Vine, Mr. Marino sent a text message to Mr. Butler to inform him that Plaintiff was leaving and that Mr. Butler contacted Deputy Tanabe to trigger the DUI stop.

24.     Moments after Plaintiff left The Vine, he was pulled over by Deputy Tanabe – without probable cause – and arrested for driving under the influence of an alcoholic beverage.

Prior to January 9, 2011, Plaintiff was never arrested for driving under the influence of an alcoholic beverage.

25.     Plaintiff is informed, believes and thereupon alleges that:  Plaintiff was not driving under the influence of an alcoholic beverage at the time that Deputy Tanabe pulled him over.

26.     Plaintiff is informed, believes and thereupon alleges that:  In exchange for Deputy Tanabe making the Dirty DUI arrest of Plaintiff, Private Investigator Butler gave Deputy Tanabe cocaine and/or an illegal firearm.

### C.     Deputy Tanabe's Colleague Confesses to another "Dirty DUI", which in turn, Leads to the Discovery of the Dirty DUI of Plaintiff

27.     Plaintiff is informed, believes and thereupon alleges that: On Wednesday, February 23, 2011 Sergeant Detective Jason Vorhauer ("Detective Vorhauer") of the Contra Costa County Sheriff's Office interviewed Deputy William Howard ("Deputy Howard") of the Contra Costa County Sheriff's Office. Deputy Howard wanted to speak to Detective Vorhauer about the recent arrest of Contra Costa Narcotics Enforcement Team Commander Norman Weilsch ("Commander Weilsch") and Private Investigator Butler for narcotics trafficking.

28.     Plaintiff is informed, believes and thereupon alleges that: Deputy Howard told Detective Vorhauer that he had information about Deputy Tanabe. Deputy Howard believed that Deputy Tanabe could be involved in some possible illegal activity with Private Investigator Butler.

29.     Plaintiff is informed, believes and thereupon alleges that: Deputy Howard told Detective Vorhauer that he had met Deputy Tanabe while working as a per-diem Deputy for the Court Services Division of the Contra Costa County Sheriff's Office. Deputy Howard stated that he also had worked a few shifts with Deputy Tanabe on patrol in the Town of Danville. Deputy Howard stated that he and Deputy Tanabe have a "casual/friendly/business relationship."

30.     Plaintiff is informed, believes and thereupon alleges that: Deputy Howard further told Detective Vorhauer that on Friday, January 14, 2011, he was on patrol with Deputy Tanabe in the Town of Danville. Deputy Howard stated that during this shift Deputy Tanabe received

approximately eight to ten personal cell phone calls from someone Deputy Tanabe identified as his "PI friend." (The "PI friend" later was identified as Private Investigator Butler by Deputy Tanabe). Deputy Howard stated that during these phone calls it appeared that Deputy Tanabe was receiving updates about an individual, who later was identified as Mitchell Katz, who was drinking alcoholic beverages at a wine bar. The wine bar later was identified as "The Vine" located at 480 Hartz Avenue, Danville, California. Deputy Howard stated that he only could hear Deputy Tanabe's side of the conversation, but it appeared that Private Investigator Butler was giving Deputy Tanabe updated information relating to Plaintiff's sobriety.

31.     Plaintiff is informed, believes and thereupon alleges that: During the course of the conversations between Deputy Tanabe and Private Investigator Butler, Butler gave Deputy Tanabe a description of the vehicle that Mitchell Katz would be driving once he left The Vine. Deputy Tanabe then drove around the immediate vicinity of The Vine and located a white pickup truck that Private Investigator Butler described as belonging to Mitchell Katz. While driving past The Vine, Deputy Howard heard Deputy Tanabe ask Private Investigator Butler if that was him (Private Investigator Butler) sitting in a Hummer parked next to The Vine. As Deputy Tanabe drove past the Hummer, Deputy Howard could see that the Hummer was occupied by a male subject. (Later, when members of the State of California Department of Justice arrested Private Investigator Butler, they seized a Hummer that belonged to Private Investigator Butler).

32.     Plaintiff is informed, believes and thereupon alleges that: Deputy Howard said that after locating the white pickup truck, Deputy Tanabe found a location close to the pickup truck at which Deputy Tanabe could hide his police vehicle and watch the pickup truck. Deputy Howard said that a short time later, Plaintiff came out of The Vine and approached the pickup truck. Deputy Howard said that Tanabe confirmed with Private Investigator Butler that the individual at the pickup truck was Mitchell Katz, the intended target. Mitchell Katz then got into the pickup truck, drove a short distance, parked the pickup truck a short distance from The Vine and walked back to The Vine. After a short wait, Mitchell Katz reemerged from The Vine, walked to his pickup truck, got inside and started to drive away.

///

33.     Plaintiff is informed, believes and thereupon alleges that: At some point during this sequence of events, Deputy Howard asked Deputy Tanabe what was going on. Deputy Tanabe responded that they were about to conduct a "Dirty DUI" stop on Mitchell Katz.

34.     Plaintiff is informed, believes and thereupon alleges that: Deputy Howard observed that immediately after Mitchell Katz started to drive his pickup truck, Deputy Tanabe pulled his patrol vehicle behind the pickup truck and followed Mitchell Katz for a short distance. At some point while Deputy Tanabe was following the pickup truck, Deputy Tanabe alleged that Mitchell Katz made a right hand turn without signaling. Deputy Tanabe then immediately conducted a traffic enforcement stop based upon this alleged probable cause.

35.     Plaintiff is informed, believes and thereupon alleges that: Deputy Tanabe then performed a Driving Under the Influence investigation of Mitchell Katz and subsequently arrested him for driving under the influence of an alcoholic beverage.

36.     Plaintiff is informed, believes and thereupon alleges that: Deputy Tanabe processed Mitchell Katz at the Danville Police Station and then transported Mitchell Katz to the Martinez Detention Facility. While discussing the arrest of Mitchell Katz, Deputy Howard told Deputy Tanabe that he felt sorry for Mitchell Katz because just before Deputy Tanabe arrested Mitchell Katz, Mitchell Katz had been in The Vine discussing a business deal with unidentified persons to be featured in a reality show. Deputy Howard felt that Mitchell Katz's arrest might affect his chances of getting the reality show. Deputy Tanabe responded that Deputy Howard should not worry because the whole thing was a "set up." Deputy Tanabe did not explain to Deputy Howard what he meant by "set up." Deputy Tanabe added that he arrested Mitchell Katz because Mitchell Katz needed to be "dirtied" up for a future court date. Deputy Howard felt uncomfortable with Mitchell Katz's arrest, but because of his inexperience, Deputy Howard did not question Mitchell Katz's arrest at that time.

37.     Plaintiff is informed, believes and thereupon alleges that: On Wednesday, February 16, 2011 (the date that members of the State of California Department of Justice arrested Private Investigator Butler and Commander Weilsch) at approximately 8:00pm, Deputy Tanabe called Deputy Howard at his residence. Deputy Tanabe asked Deputy Howard if he

1    could come over for a visit. Deputy Howard agreed to meet with Deputy Tanabe. Deputy

2    Howard said that he could tell that something was bothering Deputy Tanabe.

3        38.    Plaintiff is informed, believes and thereupon alleges that: When Deputy Tanabe

4    arrived he asked Deputy Howard if he had been watching the news about the arrests of Private

5    Investigator Butler and Commander Weilsch. Deputy Howard responded that he had not yet

6    watched the news. Deputy Tanabe then told Deputy Howard about the arrests of Private

7    Investigator Butler and Commander Weilsch. Deputy Tanabe stated that he felt that his telephone

8    probably was "bugged" because of his personal relationship with Private Investigator Butler.

9    Deputy Tanabe then confirmed that his "PI friend" was Private Investigator Butler.

10       39.    Plaintiff is informed, believes and thereupon alleges that: Deputy Tanabe

11   continued by telling Deputy Howard that they no longer could talk on the phone because they

12   probably were being "bugged." Deputy Tanabe went on to tell Deputy Howard that the police

13   were going to start investigating him (Deputy Tanabe) because of the "Dirty DUIs."

14       40.    Plaintiff is informed, believes and thereupon alleges that: Deputy Tanabe said that

15   he knew that the police were going to serve a search warrant on his home soon, and he was

16   concerned because an item that he possessed was going to be found during the search of his

17   residence. Deputy Tanabe asked if he could leave something at Deputy Howard's residence until

18   "things settled down." Deputy Tanabe told Deputy Howard that he (Deputy Tanabe) already had

19   instructed his wife on how to act when the police served the search warrant and executed the

20   search. Deputy Tanabe added that he felt that when the police served the search warrant that they

21   would kill his dog to punish him.

22       41.    Plaintiff is informed, believes and thereupon alleges that: Deputy Howard agreed

23   to take the item from Deputy Tanabe. Deputy Tanabe then went out to his vehicle and retrieved

24   an item covered with a black plastic garbage bag. Deputy Tanabe asked Deputy Howard to place

25   the item in his attic to keep it hidden. Deputy Howard said that he felt uncomfortable with what

26   Deputy Tanabe was asking him to do, but that Deputy Howard did not want to cause a

27   confrontation with Deputy Tanabe so he took the item.

28   / / /

42.     Plaintiff is informed, believes and thereupon alleges that: Deputy Howard told Detective Vorhauer that he did not look in the bag and did not know what it contained. Deputy Howard said that after one week of having the item and hearing more information about the arrests of Private Investigator Butler and Commander Weilsch, Deputy Howard felt that he might be hiding something illegal. After much thought, Deputy Howard decided to contact the Contra Costa County Sheriff's Office and turn over the item that Deputy Tanabe had asked him to hide.

43.     Plaintiff is informed, believes and thereupon alleges that: Detective Vorhauer asked Deputy Howard what he knew about the relationship between Deputy Tanabe and Private Investigator Butler. Deputy Howard stated that he knew that Deputy Tanabe started working for Private Investigator Butler at his private investigation business shortly after Deputy Tanabe was fired from his position as a sworn peace officer with the City of Antioch Police Department. Deputy Howard stated that he believed that Deputy Tanabe and Private Investigator Butler spoke to each other approximately three to four times per week. Deputy Howard added that Deputy Tanabe recently was conducting surveillance for Private Investigator Butler while Deputy Tanabe was employed by the Contra Costa County Sheriff's Office.

44.     Plaintiff is informed, believes and thereupon alleges that: On Wednesday, February 23, 2011, Detective Vorhauer went to Deputy Howard's residence and retrieved the item that Deputy Howard had agreed to hold for Deputy Tanabe. Detective Vorhauer inspected the contents of the black plastic garbage bag and found a contraband Bushmaster AR-15 assault rifle. Detective Vorhauer later determined that the assault rifle was not registered to Deputy Tanabe and did not qualify as an assault weapon owned and registered before the ban on owning assault weapons.

45.     Plaintiff is informed, believes and thereupon alleges that: On Monday, February 28, 2011, Detective Vorhauer met with Contra Costa County District Attorney Investigator Daryl Jackson. Jackson told Detective Vorhauer that a search of Private Investigator Butler's cell phone confirmed that Deputy Tanabe and Butler had made arrangements to have Mitchell Katz arrested.

///

46.   Plaintiff is informed, believes and thereupon alleges that: Also on Monday, February 28, 2011, "it was discovered that there was information on Private Investigator Butler's cell phone in regards to a [Dirty DUI] arrest of Plaintiff on January 9, 2011. Detective Vorhauer conducted a records check and found that Plaintiff was indeed arrested on January 9, 2011 by Deputy Tanabe for driving under the influence of an alcoholic beverage (Sheriff's DR#516). It appears that Plaintiff was targeted by Deputy Tanabe and Private Investigator Butler based on the text messages."

47.   Plaintiff is informed, believes and thereupon alleges that: Detective Vorhauer discovered additional information relating to a third "Dirty DUI" arrest on November 2, 2010 in which Deputy Tanabe – while off duty – tipped off Deputy Tom Henderson ("Deputy Henderson") of the Contra Costa Sheriff's Office. Specifically, Deputy Henderson stated that he received a call from Deputy Tanabe in which Deputy Tanabe told him that he was off duty in a bar in the downtown area of Danville and an individual was drinking heavily and would be leaving the bar soon. Deputy Tanabe asked Deputy Henderson to conduct a traffic stop for DUI once the individual left the bar. Deputy Tanabe further told Deputy Henderson that the individual was being targeted because the individual was cheating on his wife and they (Private Investigator Butler and Deputy Tanabe) wanted to "dirty him up" for a future court case. Deputy Tanabe provided a description of the individual's vehicle and told Deputy Henderson that the individual was leaving the bar. Deputy Henderson parked on a side street and waited for the vehicle to pass by his patrol car. Deputy Henderson then conducted a traffic enforcement stop on the individual for driving 35 mph in a 25 mph zone. Deputy Henderson asked Deputy Robert Durrer to conduct the DUI investigation. Deputy Durrer determined that the individual was under the influence of an alcoholic beverage and arrested him for driving under the influence.

48.   Plaintiff is informed, believes and thereupon alleges that: Detective Vorhauer reviewed the text messages retrieved from Private Investigator Butler's cell phone. On January 22, 2011, Private Investigator Butler wrote Deputy Tanabe a text message that stated: "Steve, can you get an update on the DUI case involving [the individual arrested on November 2, 2010 by Deputy Durrer]."

1    49.    On March 4, 2011, Detective Vorhauer stated under penalty of perjury in his

2    Affidavit for Search Warrant for the issuance of a Search Warrant for Deputy Tanabe's residence

3    located at 1872 Green Valley Road, Alamo, California in pertinent part: "It is my opinion that

4    Deputy Tanabe has abused his police powers and has been acting as an agent of Butler while on

5    duty as an Officer of the City of Danville.... It is my belief ... that Deputy Tanabe and Butler

6    have conspired to set up other individuals to be arrested for driving under the influence of an

7    alcoholic beverage. I believe that Deputy Tanabe and/or Butler are receiving financial benefits

8    from clients of Butler's private investigation business by creating a situation in which the target

9    will be entrapped and will inevitably become a victim of a "Dirty DUI" vehicle stop." (A true

10   copy of the March 4, 2011 Affidavit for Search Warrant by Detective Vorhauer is attached as

11   Exhibit B).

## IV.    STATEMENT OF DAMAGES

13   50.    As a result of the acts and/or omissions of Defendants Ms. Porter, Mr. Thompson,

14   Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County, and Does One through Fifty,

15   and each of them, Plaintiff incurred expenses relating to defending against the Dirty DUI,

16   including attorneys' fees and costs, in amounts to be determined according to proof.

17   51.    As a result of the acts and/or omissions of Defendants Ms. Porter, Mr. Thompson,

18   Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County, and Does One through Fifty,

19   and each of them, Plaintiff suffered injury to his reputation in the community.

20   52.    As a result of the acts and/or omissions of Defendants Ms. Porter, Mr. Thompson,

21   Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County, and Does One through Fifty,

22   and each of them, Plaintiff suffered lost employment opportunities.

23   53.    As a result of the acts and/or omissions of Defendants Ms. Porter, Mr. Thompson,

24   Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County, and Does One through Fifty,

25   and each of them, Plaintiff suffered emotional distress including suffering, anguish, fright,

26   horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame, in amounts to be

27   determined according to proof.

28   / / /

54.     As set forth above, the acts and/or omissions of Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County, and Does One through Fifty, and each of them, were willful, wanton, reckless, malicious, oppressive and/or done with a conscious or reckless disregard for the constitutional rights and state law rights of Plaintiff. Plaintiff therefore will seek an award of punitive and exemplary damages, against Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County, and Does One through Fifty, and each of them, in amounts to be determined according to proof.

55.     Plaintiff retained private counsel to represent him in this matter and is entitled to an award of attorneys' fees, pursuant to 42 U.S.C. Section 1988.

## V.    PLAINTIFFS' CLAIMS

All claims for relief set forth below incorporate all of the facts set forth above.

## FIRST CLAIM FOR RELIEF

### Bad Faith Arrest

### 42 U.S.C. § 1983 – Violation of the Fourth Amendment to the U.S. Constitution

### (Deputy Tanabe)

56.     The above-described Dirty DUI arrest of Plaintiff by Deputy Tanabe was the result of entrapment, without purpose or justification in law, lacked probable cause, was objectively unreasonable, was unnecessary, was not privileged in any way or protected by qualified immunity, and was in violation of the Fourth Amendment.

57.     Plaintiff is entitled to judgment against Deputy Tanabe who arrested Plaintiff or aided in the Dirty DUI arrest of Plaintiff.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## SECOND CLAIM FOR RELIEF

### Conspiracy to Commit Bad Faith Arrest

### 42 U.S.C. § 1983 – Violation of the Fourth Amendment to the U.S. Constitution

### (Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, and Does One to Twenty-Five)

58.     The above-described Dirty DUI arrest of Plaintiff by Deputy Tanabe was the result of a conspiracy to deprive Plaintiff of his constitutional rights by means of a scheme to entrap him to be arrested for driving under the influence of an alcoholic beverage. Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County, and Does One through Twenty-five, and each of them, agreed with each other to accomplish the Dirty DUI arrest of Plaintiff in violation of his Fourth Amendment rights.

## THIRD CLAIM FOR RELIEF

### Egregious Official Conduct Intended to Injure Unjustified by Any Government Interest

### 42 U.S.C. § 1983 – Violation of the Fourteenth Amendment to the U.S. Constitution

### (Deputy Tanabe)

59.     The above-described Dirty DUI arrest of Plaintiff by Deputy Tanabe was the result of entrapment, without purpose or justification in law, was subjectively unreasonable, was unnecessary, was not privileged in any way or protected by qualified immunity, and was in violation of the Fourteenth Amendment. "Entrapment is indistinguishable from other law enforcement practices which the courts have held to violate due process. Entrapment is an affront to the basic concepts of justice. Where it exists, law enforcement techniques become contrary to the established law of the land as an impairment to due process." *Baker v. McCollan*, 443 U.S. 137 142-143 (1979). The actions and behavior of Deputy Tanabe in entrapping Plaintiff via a Dirty DUI arrest constituted abuses of power, which "shock the conscience", in violation of the Fourteenth Amendment.

/ / /

/ / /

/ / /

## FOURTH CLAIM FOR RELIEF

### Conspiracy to Commit Egregious Official Conduct Intended to

### Injure Was Unjustified by Any Government Interest

### 42 U.S.C. § 1983 – Violation of the Fourteenth Amendment to the U.S. Constitution

### (Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy

### Tanabe, and Does One to Twenty-Five)

60.     The above-described Dirty DUI arrest of Plaintiff by Deputy Tanabe was the result of a conspiracy to deprive Plaintiff of his constitutional rights by means of a scheme to entrap him to be arrested for driving under the influence of an alcoholic beverage. Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County, and Does One through Twenty-five, and each of them, agreed with each other to accomplish the Dirty DUI arrest of Plaintiff in violation of his Fourteenth Amendment rights.

## FIFTH CLAIM FOR RELIEF

### Unconstitutional Hiring of Deputy Tanabe

### 42 U.S.C. § 1983 – Violation of the Fourteenth Amendment to the U.S. Constitution

### (Sheriff Livingston and Does Twenty-Six to Fifty)

61.     Sheriff Livingston and Does Twenty-six to Fifty, and each of them, either disregarded a known or obvious consequence of hiring Deputy Tanabe or failed to scrutinize adequately Deputy Tanabe's background before hiring him. Such actions or inactions by Sheriff Livingston and Does Twenty-six to Fifty, and each of them, in hiring Deputy Tanabe reflected deliberate indifference to the substantial risk and plainly obvious consequence that Deputy Tanabe would engage in corrupt practices in violation of the Fourth and Fourteenth Amendments following his hiring by the County and Sheriff's Office as a sworn peace officer.

62.     By and through the acts and omissions alleged herein, Sheriff Livingston and Does Twenty-six to Fifty, and each of them, unlawfully subjected Plaintiff to a Dirty DUI arrest thereby violating Plaintiff's rights under the Fourth and Fourteenth Amendments.

/ / /

/ / /

1

**SIXTH CLAIM FOR RELIEF**

**Unconstitutional Policy and Practice (*Monell-Adickes*)**

**42 U.S.C. §§ 1983, 1986; Fourteenth Amendment to the U.S. Constitution**

**(County of Contra Costa)**

63.     The County is liable to Plaintiff because the actions of Sheriff Livingston and Does Twenty-six to Fifty, and each of them, in hiring Deputy Tanabe (1) were caused by customs or policies of the Sheriff's Office; (2) were caused by deliberate indifference of the Sheriff's Office; and/or (3) were ratified by final decision-makers of the Sheriff's Office.

64.     Pursuant to the rules set forth in the *Monell* and *Adickes* decisions by the U.S. Supreme Court, the above described conduct of the County, its Sheriff's Office and numerous other officials, the County is jointly and severally liable with Sheriff Livingston and Does Twenty-six to Fifty, and each of them, for the injuries, deprivations and losses sustained by the Plaintiff.

**SEVENTH CLAIM FOR RELIEF**

**False Arrest and Imprisonment**

**(Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County and Does One to Twenty-Five)**

65.     The above-described Dirty DUI arrest of Plaintiff by Deputy Tanabe was the result of a conspiracy to deprive Plaintiff of his constitutional rights by means of a scheme to entrap him to be arrested for driving under the influence of an alcoholic beverage. Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County, and Does One through Twenty-five, and each of them, agreed with each other to accomplish the Dirty DUI arrest of Plaintiff in order to have Plaintiff falsely arrested and imprisoned.

66.     Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County, and Does One through Twenty-five, and each of them, either falsely arrested Plaintiff or caused Plaintiff to be falsely arrested without a warrant.

/ / /

/ / /

67.     Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County, and Does One through Twenty-five, and each of them, was a substantial factor in causing Plaintiff's harm.

68.     Defendant County is liable for the actions of Deputy Tanabe, pursuant to the doctrine of *respondeat superior*.

69.     Plaintiff was harmed by the actions of Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County, and Does One through Twenty-five, and each of them,

## EIGHTH CLAIM FOR RELIEF

### Abuse of Process

**(Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County and Does One to Twenty-Five)**

70.     The above-described Dirty DUI arrest of Plaintiff by Deputy Tanabe was the result of a conspiracy to deprive Plaintiff of his constitutional rights by means of a scheme to entrap him to be arrested and prosecuted for driving under the influence of an alcoholic beverage. Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County, and Does One through Twenty-five, and each of them, agreed with each other to accomplish the Dirty DUI arrest of Plaintiff in order to have Plaintiff falsely arrested and prosecuted.

71.     Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County, and Does One through Twenty-five, and each of them, caused Plaintiff to be falsely arrested and prosecuted for driving under the influence of an alcoholic beverage.

72.     Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County, and Does One through Twenty-five, and each of them, intentionally used the false arrest and prosecution of Plaintiff for driving under the influence of an alcoholic beverage in order for Ms. Porter to attempt to obtain an advantage over Plaintiff regarding the custody of their child.

/ / /

73. Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County, and Does One through Twenty-five, and each of them, was a substantial factor in causing Plaintiff's harm.

74. Defendant County is liable for the actions of Deputy Tanabe, pursuant to the doctrine of *respondeat superior*.

75. Plaintiff was harmed by the actions of Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County, and Does One through Twenty-five, and each of them,

## NINTH CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress

### Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County and Does One to Twenty-Five)

76. The above-described Dirty DUI arrest of Plaintiff by Deputy Tanabe was the result of a conspiracy to deprive Plaintiff of his constitutional rights by means of a scheme to entrap him to be arrested and prosecuted for driving under the influence of an alcoholic beverage. Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County, and Does One through Twenty-five, and each of them, agreed with each other to accomplish the Dirty DUI arrest of Plaintiff in order to intentionally inflict emotional distress upon Plaintiff.

77. The conduct of Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County, and Does One through Twenty-five, and each of them, was outrageous.

78. Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County, and Does One through Twenty-five, and each of them, intended to cause Plaintiff emotional distress or, in the alternative, Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County, and Does One through Twenty-five, and each of them, acted with reckless disregard of the probability that Plaintiff

would suffer emotional distress, knowing that Plaintiff was present when he was subjected to the Dirty DUI arrest.

79.     The conduct of Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County, and Does One through Twenty-five, and each of them, was a substantial factor in causing Plaintiff's severe emotional distress

80.     Defendant County is liable for the actions of Deputy Tanabe, pursuant to the doctrine of *respondeat superior*.

81.     Plaintiff suffered severe emotional distress.

### TENTH CLAIM FOR RELIEF

### Negligence

**(Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County and Does One to Twenty-Five)**

82.     Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County, and Does One through Twenty-five, and each of them, owed Plaintiff a duty to use reasonable care in order to prevent harm to Plaintiff.

83.     Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County, and Does One through Twenty-five, and each of them, were negligent in that they failed to use reasonable care in order to prevent harm to Plaintiff.

84.     Plaintiff suffered harm as a result of the negligent conduct of Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County, and Does One through Twenty-five, and each of them, including serious emotional distress.

85.     The negligent conduct of Defendants Ms. Porter, Mr. Thompson, Private Investigator Butler, Mr. Chetcuti, Deputy Tanabe, County, and Does One through Twenty-five, and each of them, was a substantial factor in causing Plaintiff's harm.

86.     Defendant County is liable for the actions of Deputy Tanabe, pursuant to the doctrine of *respondeat superior*.

/ / /

/ / /

1

## ELEVENTH CLAIM FOR RELIEF

### Negligent Hiring of Deputy Tanabe

**(Sheriff Livingston, County of Contra Costa and Does Twenty-Six to Fifty)**

87.     Sheriff Livingston, County and Does Twenty-six to Fifty, and each of them, owed Plaintiff and other members of the public a duty to use reasonable care in hiring Deputy Tanabe in order to prevent harm to Plaintiff.

88.     Sheriff Livingston, County and Does Twenty-six to Fifty, and each of them, were negligent in that they failed to use reasonable care in hiring Deputy Tanabe in order to prevent harm to Plaintiff in that Deputy Tanabe was incompetent or unfit for his position as a peace officer. Specifically, Sheriff Livingston, County and Does Twenty-six to Fifty, and each of them, knew or should have know that Deputy Tanabe would engage in corrupt practices while employed as a peace officer

89.     Plaintiff suffered harm as a result of the negligent conduct of Sheriff Livingston, County and Does Twenty-six to Fifty, and each of them.

90.     The negligent conduct of Sheriff Livingston, County and Does Twenty-six to Fifty, and each of them, was a substantial factor in causing Plaintiff's harm.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

**PRAYER**

1.    For compensatory damages and other special damages according to proof;

2.    For general damages according to proof;

3.    For punitive damages against all individual defendants according to proof;

4.    For prejudgment interest at the legal rate according to proof;

5.    For costs and attorney's fees; and

6.    For such other relief as the Court may deem proper.

Dated: August 13, 2012

GEARINGER LAW GROUP

By: _Brian Gearinger_
BRIAN GEARINGER
R. STEPHEN M. LAROE
Attorneys for Plaintiff HASAN ARDA AKSU

1

**JURY TRIAL DEMANDED**

2     Plaintiff Hasan Arda Aksu demands a trial by jury in this action.

3   Dated: August 13, 2012

4                           GEARINGER LAW GROUP

5

6   By: *Brian Gearinger*

    BRIAN GEARINGER

7   R. STEPHEN M. LAROE

    Attorneys for Plaintiff HASAN ARDA AKSU

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A



F I L E D

MAY 3 1 2012

K. TORRE, CLERK OF THE COURT
SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF CONTRA COSTA
By_____, Deputy Clerk

## Superior Court of California
## County of Contra Costa

| | |
|---|---|
| **In re the Marriage/Matter of:**<br><br>**Arda Aksu**<br><br>(Petitioner),<br><br>**and**<br><br>**Suzanne Porter**<br><br>(Respondent). | Case Nos.: D 06-04997<br><br><br>Order on Statement of<br>Decision After Trial<br>(Domestic Violence Restraining Order) |

### I.    Introduction

The following findings and orders of the court constitute this court's Statement of Decision pursuant to CCP §632 and Rule 3.1590 of the California Rules of Court.

Trial evidence was heard on December 14 and 15, 2011 and completed on April 30, 2012. Mr. Aksu was represented at trial by Peter Langley, Esq. and Ms. Porter was represented by Joseph Tully Esq. who appeared specially only in connection with the matters to be addressed at this trial.

The Court is called upon in this case to decide whether there is sufficient proof to establish by a preponderance of the evidence that Suzanne Porter has committed domestic violence thus justifying the issuance of a long-term restraining order. Mr. Specifically, Mr. Aksu contends that Ms. Porter has engaged in four separate instances which separately and collectively amount to a course of conduct that constitutes domestic

1

violence within the meaning of Family Code §§ 6203 and 6211. Mr. Aksu alleges that the conduct has occurred both before and after the issuance of two separate restraining orders entered on September 2, 2009 (Pet. Exh. 2) and October 29, 2010 (Pet. Exh. 7).

Ms. Porter has denied each of the allegations. She testified that the two earlier incidents in essence were initiated by Mr. Aksu. With regard to the two latest incidents, Ms. Porter testified that she did not intentionally commit a restraining order violation because the evidence fails to show her involvement in the alleged conduct.

For the reasons stated below, the court finds that the proof has established by a preponderance of the evidence that Ms. Porter has committed each of the four acts alleged by Mr. Aksu, that the acts individually and collectively constitute domestic violence within the meaning of FC §6320.

Because the evidence proved each of the four instances of domestic violence, the court finds that a restraining order is warranted. The court bases this restraining order on the acts of domestic violence discussed below at Sections II.C. and II.D. The court additionally finds that the acts of domestic violence discussed in Sections II.A. and II.B. constitute evidence that supports the court's decision to issue the restraining order.

The court also finds that Ms. Porter should be sanctioned under FC §§271 and 6344 for the costs, including attorney fees, that her conduct has caused to Mr. Aksu.

II.    Findings of Fact

The court records show that the judgment of dissolution was entered in this case on January 28, 2008 and that the parties have one son who is under ten years of age (hereafter "the Son").

A.    Incident on June 8, 2009

2

On June 8, 2009, Mr. Aksu was at his residence with his current wife and the son. At that time, Mr. Aksu had custody of the son for a "dinner break." According to Mr. Aksu, he was to have custody until 8 p.m. at which time Ms. Porter's custody time would commence. Ms. Porter arrived an hour early at 7 p.m. Even though requested to come back at 8 p.m. by Mr. Aksu, Ms. Porter pushed her way into the residence. An argument ensued and during the argument Ms. Porter struck Mr. Aksu in the head with a shoe she picked up inside of Mr. Aksu's residence. Mr. Aksu described Ms. Porter as being a tall, imposing woman who has weighed as much as 220 pounds.

The court credits Mr. Aksu's version of the events. He stated that Ms. Porter tried to enter his house and that he explicitly told her to return later at the appointed time. He said that Ms. Porter picked a shoe off the floor and hit him with it. Mrs. Aksu confirmed Mr. Aksu's account of the events including the fact that Ms. Porter forced her way into the residence and the fact that Ms. Porter struck Mr. Aksu in the head with a shoe.

Ms. Porter did not deny trying to enter Mr. Aksu's residence. She explained that Mr. Aksu had shut the door of his residence in such a way as to cause the door to hit and injure her. Nor did Ms. Porter deny hitting Mr. Aksu with a shoe. Rather she attempted to mitigate her behavior by explaining that she had promised her son that he only needed to be with his father until 7 p.m. as a way of getting the son to go to the visit. She said she was trying to pick the son up at 7 p.m. as she had promised and Mr. Aksu would not let her.

In the court's view, Ms. Porter was the aggressor in this situation. She attempted to force her way into Mr. Aksu's house and, after doing so, picked up a shoe from within the residence and hit Mr. Aksu in the head with it. Even if Mr. Aksu was not being cooperative with Ms. Porter, he was entitled to be left alone inside his house.

3

B.      Incident on July 10, 2009

On July 10, 2009, Mr. Aksu was preparing for a trip to Turkey to visit relatives. Ms. Porter drove to Mr. Aksu's house to drop off the Son for a visit. When Mr. Aksu went to the car to retrieve the Son, Ms. Porter asked him to deliver a gift from her to certain of his relatives. Ms. Porter also asked Mr. Aksu to have a little more time with the Son. Mr. Aksu declined both requests.

Ms. Porter got very upset and started yelling at him. According to Mr. Aksu, he then leaned into the car to pick up the Son. As he did so, Ms. Porter grabbed his glasses and broke them and also grabbed and tore his shirt. Mr. Aksu took the son back toward the house and returned to the car to retrieve his glasses. The Son ran back to the car. Mr. Aksu testified that he asked for the glasses but Ms. Porter refused while screaming threats at him. As he tried to reach into the car to fetch his glasses, Ms. Porter started to drive away. Mr. Aksu testified that as a consequence he completely entered the car. As Ms. Porter drove away, Mr. Aksu asked her to stop and she refused. Mr. Aksu testified that he put the car in park and jumped from the car. He then went to a neighbor and called the police.

Officer Buda of the Martinez Police Department was assigned to investigate the matter. He took photos of injuries on Mr. Aksu's face and shoulder. Berna Aksu, Mr. Aksu's wife also took photos of his injuries on that date. See Pet. Exh. 12A. Officer Buda noted no visible injuries to Ms. Porter who complained of being injured in her struggle with Mr. Aksu. After completing his investigation, Officer Buda arrested Ms. Porter.

While Mr. Aksu was in Turkey on his trip, Ms. Porter sought and obtained a Temporary Restraining Order (TRO) against him. Neither party introduced any specific evidence as to the basis for the TRO issued at Ms. Porter's request. The court can only

4

conclude that the TRO was issued in connection with the same events that resulted in Ms. Porter's arrest.

The court credits Mr. Aksu's testimony that Ms. Porter became verbally and physically abusive when he declined to allow Ms. Porter more time with the son or to help deliver Ms. Porter's gift(s) to his relatives in Turkey.

Ms. Porter testified that she started to physically resist Mr. Aksu when he announced he was getting into the car to "go with her." She said that P came into contact with her and that her resistance arose from her fear of him being in her car. She said she was initially unaware that she had scratched Mr. Aksu.

The court finds that Ms. Porter also initiated this physical altercation with Mr. Aksu and caused him clearly identifiable physical injuries. The court credits Mr. Aksu's testimony that he did not initiate any physical contact with Ms. Porter and that he did not attempt to have physical contact with her.

C.     Incident on October 13, 2010

After the TRO was issued following the July 10, 2009 incident, the parties agreed to a mutual non-CLETS restraining order. The order was entered on September 2, 2009. Pet. Exh. 2. Among other things, it provided that both parties would stay at least one hundred yards away from each other and each other's residence.

The court finds by a preponderance of the evidence that Ms. Porter violated this order by coming within 100 yards of Mr. Aksu's residence in the late evening of October 13, 2010. The evidence shows that the next door neighbor of Mr. Aksu, Antonnetta Kalygzhieva, heard a loud noise at the side of her residence at about 11:15 p.m. to 11:30 p.m. Her residence was at 6815 Waverly and Mr. Aksu's residence was at 1621 Waverly. She looked out of her bathroom window and saw a person using a patio chair to jump over

the fence in her side yard heading toward the front of her house. She said "Who are you?" to the person but got no response. She then saw the person head for the front of Mr. Aksu's house after the person was on the other side of the fence. She noted that the person was tall and had a pony tail.

The neighbor checked at the front of her residence and then waited and watched the front of her house. While she watched she saw a black, small SUV pass back and forth in front of her house. After she saw the car hit a re-cycle bin and drive off she called the police. When a police officer arrived, Ms. Kalygzhieva said she saw the person with the pony tail standing in the direction of Mr. Aksu's house. She said one of the officers told her to go inside her house. The next day, Ms. Kalygzhieva checked the area around her fence and observed that a piece of wood had been broken off of the fence and a patio chair moved to the area where the person had jumped the fence.

Officer Leong testified that he responded to the call relating to this incident. As he was speaking to Ms. Kalygzhieva, he saw a person walk to small, dark SUV pull away from the curb several houses away, make a u-turn on Waverly, and head east on Waverly. Officer Leong could provide no description of the person. However, his testimony was consistent with that of Ms. Kalygzhieva who stated that the person with the pony tail was standing in the same general area.

A few minutes later, Officer Gaul of the Martinez Police Department stopped Ms. Porter who was driving a car he described as a dark hatchback automobile. He noted that Ms. Porter had long, blond hair and had on dark, tight pants and a dark top. Most significantly, he noticed that Ms. Porter had some sort of vegetation or twigs in her hair and fresh scratches or abrasions on her hands. Officer Gaul testified that Ms. Porter

6

denied she had jumped the fence near Mr. Aksu's home and stated that she had been waiting for a friend who lived on Waverly.

In her testimony, Ms. Porter stated that she had gone to a home on Waverly that night to talk to a male friend of hers about problems she was having with her current husband. She testified that she and the friend, Mr. Platt, had exchanged several text messages before she realized that he was not at home but at work. She said she did not see any car driving up and down on Waverly as testified to by Ms. Kalygzhieva. She said she waited in her car the whole time and, after finishing a cigarette, had left to drive home. At that time she was stopped by Officer Gaul. She denied that she had any vegetation in her hair or that she had fresh injuries to her hands as testified to by Officer Gaul. Contrary to the description given by Officer Gaul of Ms. Porter's hairstyle which was consistent with Ms. Kalygzhieva, Ms. Porter testified that she had a short "bob" haircut.

In the court's view, the evidence summarized above, including the circumstantial evidence, demonstrates that Ms. Porter was the person who jumped the fence adjacent to the residences of Mr. Aksu and Ms. Kalygzhieva. The circumstances showed that the prowler, a large person with long hair, tried to scale the fence and in the process broke off a portion of the fence. Ms. Kalygzhieva heard a loud noise consistent with the prowler breaking off a wooden piece from the fence. Ms. Kalygzhieva saw the prowler lingering a short distance from her house after the police arrived and Officer Leong saw a person get into a dark SUV vehicle. Officer Gaul stopped Ms. Porter a short while later and noted that she had fresh injuries to her hands and vegetation in her hair consistent with someone vaulting over and breaking off part of a fence in the area of some vegetation. Officer Gaul also noted that Ms. Porter had long blond hair and not a "bob" cut as testified to by Ms. Porter. The court also notes that Ms. Porter did not call as witnesses either her husband or

7

Mr. Platt, her friend, to corroborate her story about why she was in the vicinity of Mr. Aksu's house.

D.    The "Sting" Operation Executed by Christopher Butler

As noted above, on October 29, 2010, Judge Treat issued a TRO that protected Mr. Aksu from certain acts by Ms. Porter. There was no direct evidence on this point but the court assumes that the TRO was issued based upon the events that took place on October 13, 2010. See Section C. above.

The evidence shows that following the issuance of the TRO, Ms. Porter helped initiate and sponsor a series of deceitful acts by a private investigator designed to cause the arrest of Mr. Aksu for drunk driving. The private investigator, Christopher Butler, and his assistant, Carl Marino, devised a scheme to induce Mr. Aksu to agree to be interviewed on behalf of a local magazine and in the process drink an excessive amount of alcohol. The plan included the notion that when the "interview" concluded, Mr. Aksu would drive away from the meeting place intoxicated.

The court credits the testimony of Mr. Marino about how the scheme was accomplished and Ms. Porter's role in it. Marino testified that he and Butler met with Ms. Porter and her father to initially discuss the plan. Ms. Porter's father paid them $1,500 and they discussed the outlines of how to go about inducing Mr. Aksu to drive while intoxicated. Marino noted that at this first meeting Ms. Porter expressed a strong desire to have Mr. Aksu arrested for drunk driving because he would drink and drive with her child in the car. Marino said that Ms. Porter specifically disfavored trying to lure Mr. Aksu with female "decoys" because Mr. Aksu would not go for that specific ploy. The participants in the meeting then discussed an alternative plan to lure Mr. Aksu with the

8

idea of doing a favorable magazine story portraying him as a successful immigrant businessman.

Shortly after the meeting, Ms. Porter sent Marino an e-mail detailing a number of facts about Mr. Aksu that would be useful to the scheme. Despite the fact that she testified that she was having second thoughts about the scheme, Ms. Porter testified that she sent this e-mail. According to Marino, Ms. Porter called on several occasions to inquire about the plan going forward. Ms. Porter testified that she made no such calls.

According to Marino, he met with Ms. Porter on a second occasion just before the plan was executed to discuss the plan further. At that meeting, Ms. Porter expressed concern that the plan was not proceeding more quickly. Marino testified that he was trying to put off executing this particular one of Butler's schemes because he was in the process of trying to contact government authorities about the various illegal acts being perpetrated by Butler.

In order to be able to stall a little longer, Marino told Butler that he would take care of contacting Mr. Aksu. Nevertheless, Marino eventually called Mr. Aksu and, posing as a magazine journalist, proposed meeting with him for an interview. Marino noted that there were two others involved in the actual execution of the plot, a person who accompanied Marino and a police officer named Steve Tanabe.[1]

The meeting between Mr. Marino and Mr. Aksu went forward as planned. Marino and his companion ordered repeated "flights" of wine in order to induce Mr. Aksu to the point of intoxication. When the "interview" was complete, Mr. Aksu left the scene in his car and was stopped by Tanabe.

---

[1] It is a matter of common knowledge that Messrs. Butler and Tanabe and several others are now the subjects of federal criminal charges in the Northern District of California.

9

### III.   Discussion

Family Code sections 6320 and 6203 permit the issuance of a restraining order to prevent and/or deter a variety of acts that would cause injury to or disturb the peace of another person where a specified relationship exists or used to exist between the two parties. *See IRMO Nadkarni,* (2009) 173 Cal. App. 4th 1483, 1496.

In this case, the acts of Ms. Porter described in Sections II. A. and II. B. were misdemeanor batteries committed by Ms. Porter on the person of Mr. Aksu. The evidence relating to these acts was admitted for two limited purposes. First, the evidence as to these events was admitted for the purpose of showing the motive and intent of Ms. Porter in committing the acts referenced in Sections II.C. and II.D. above. Second, the commission of these acts was relevant to the question of whether a restraining order was necessary in order to prevent further acts of abuse by Ms. Porter.

The acts described in Section II.C. above constituted a violation by Ms. Porter of the stay-away provisions of the non-CLETS order entered on September 2009. Furthermore, Ms. Porter's conduct on October 13, 2010 clearly would and did "disturb the peace" of Mr. Aksu. *See Nadkarni, supra at 1497* (acts that disturb the peace of another may warrant the issuance of a restraining order under FC §6320). This conduct was alleged in the petition filed by Mr. Aksu.

Finally, the acts of Ms. Porter in hiring a private investigator to set up Mr. Aksu for a drunken driving arrest violate the literal terms of the TRO issued on October 29, 2010 in that Ms. Porter "indirectly" caused someone to contact Mr. Aksu for a purpose other than to peacefully discuss child custody. While the court can imagine that there might be technical violations of the TRO that would not warrant court action, the purpose of Ms. Porter's conduct was more than a technical violation. The whole point of the

10

violation of the order was to induce Mr. Aksu into a drunken driving offense so as to give Ms. Porter a significant tactical advantage in her on-going child custody conflicts with Mr. Aksu. Under the TRO, Mr. Aksu was entitled to be left alone and to expect that his only contact, direct or indirect, with Ms. Porter or someone acting for her would be solely peaceful contact relating to the collaborative compliance with the child custody orders of the court. He should not have to fear that the limited contacts permitted by the TRO might include an undercover plot to get him arrested.

In his closing argument, counsel for Ms. Porter noted that the "most recent" conduct of Ms. Porter occurred in early 2011 and that no further violations had happened since that time. He also noted certain intervening events suggesting that Mr. Aksu no longer entertained any real fear that Ms. Porter would engage in similar future acts.

The court notes that Mr. Aksu timely filed his request for a restraining order in October 2010 and, despite the significant delay before the hearing, there is nothing in the record suggesting that he has failed to diligently pursue his request. Furthermore, the record shows that Ms. Porter engaged in multiple acts of abuse that lasted over a period of time. Given the repeated instances of Ms. Porter's misconduct, it is logical that Mr. Aksu would continue to believe that there continues to be a significant risk of additional abusive acts by Ms. Porter. Mr. Aksu testified and his counsel has argued that Mr. Aksu desires the court to issue the long-term TRO so that he would have the additional peace of mind that such an order would provide him. Under the circumstances here, the court believes that the requested order is warranted.

       IV.    Attorney Fees

This court finds that an order that Ms. Porter reimburse Mr. Aksu for his attorney fees and costs should be entered pursuant to FC §§271 and 6344. These fees and costs

were established by Mr. Aksu at the hearing. Pet. Exhs. 9, 10, & 13. The language of
Family Code section 6344(b) appears to indicate that an award for attorney fees and costs
is to be limited to fees and costs associated with commencing and maintaining the TRO
proceeding. Mr. Aksu has requested reimbursement for a variety of expenses associated
with his defense of the drunken driving charges and expenses not directly related to the
initiation and maintaining of these TRO proceedings. Based upon the limiting language in
FC §6344(b), the amount awarded will only include all of the fees and costs associated
with commencing and maintaining the TRO proceeding. Therefore, the amount to be
awarded is $23,410.

V.      Objections and Proposals of the Parties

A.      Ms. Porter's Objections

1.      Objections Regarding "Jurisdiction"

New counsel for Ms. Porter objects to several aspects of the court's rulings as to
the multiple instances of alleged domestic violence.

Ms. Porter alleges that the original pleading filed by Mr. Aksu mentioned only one
instance of domestic violence - Ms. Porter contends that under commonly understood
civil pleading rules, the court's ruling must be limited to that single charged instance that
is, the incident discussed in Section II. C. above. Regarding this objection, the court
makes several observations. First, the court finds that even if the only evidence heard by
the court related to that specific incident, the court would still issue the requested
restraining order.

Second, the court finds that Ms. Porter had adequate notice that evidence as to the
other three incidents (see Section II. A., II.B., and II.C. above) would be offered by Mr.
Aksu at trial. These other occurrences were discussed in court before the trial started and

12

the court ruled that evidence as to these instances would be admitted because they were relevant to the issuance of the requested protective order. Ms. Porter's attorney did not request a continuance on the basis of an inadequate opportunity to prepare a defense. The trial started in December, 2011 and did not conclude until April 30, 2012. Therefore, Ms. Porter had ample time to understand and to oppose any of the evidence being offered by Mr. Aksu relating to these other "uncharged" incidents.

Third, it is doubtful that the pleading requirements of CCP §425.10 are applicable to the type of petition filed in this matter. While asserting categorically that the requirements of CCP §425.10 apply to domestic violence petitions such as was filed by Mr. Aksu, Ms. Porter cites no specific case for that assertion. It is true that the civil rules are generally applicable to family law proceedings. FC §210. However, it is not entirely clear that Mr. Aksu was required to do anything more than file a standard form DV-100 requesting an order and providing an affidavit that contained reasonable proof of a past act or acts of domestic violence. FC §6300; *See IRMO Andreson,* (1995) 28 Cal. App. 4th 873, 878-879.

To the extent that Ms. Porter suggests that the civil pleading rules require that petitions requesting such restraining orders must allege each and every instance of domestic violence to be considered at the contested hearing, this court rejects such an interpretation. In this case, the court's order is supported by evidence relating to an act by Ms. Porter that occurred after Judge Treat's restraining order of October 29, 2010. See incident discussed at Section IV.D. above.

Ms. Porter would require that each petitioner be required to file yet another petition or amended pleading following the issuance of a domestic violence TRO whenever the petitioner intends to offer evidence of violations that come after the initial

13

TRO has been issued. The court rejects such a requirement. Such an interpretation would be an impractical and unfair application of the pleading rules especially to pro se litigants. In this court's experience, more than half of the parties in these types of matters appear pro se. To interpret the applicable rules to require a person seeking an order to put in writing every single instance where he/she has been abused at the risk of having that information not considered by the court would be a tremendous burden to both petitioners and respondents in these cases.

In any event, the court finds that Ms. Porter's counsel at trial had adequate notice of the incidents of domestic violence alleged by Mr. Aksu relating to dates other than October 13 and 14, 2010. He did not ask for a continuance of the trial once the court ruled on his in limine motions. Furthermore, he had an extended period after the start of the trial (the period between December 15, 2011 and April 30, 2012) to gather and prepare any additional evidence to defend against these other allegations of abuse.

### 2. Objection Regarding Res Judicata Principles

Ms. Porter complains that this court's ruling involves a re-litigation of issues that were resolved by issuance of a stipulated restraining order on September 2, 2009. Prior to the start of trial, counsel for Ms. Porter (Mr. Tully) objected to the court's consideration of the two instances of domestic violence allegedly committed by Ms. Porter in 2009. These incidents are discussed at Sections II.A. and II.B. above. The court ruled that a restraining order would not be based on either or both of those incidents. Rather, the court would hear evidence as to those incidents as relevant to its consideration of whether Ms. Porter had committed certain acts on October 14, 2010.

The court agrees that it would be inappropriate to conduct a de novo proceeding and issue a new and different order based upon those same allegations. The court has not

done so. As noted above, this court was asked to determine whether or not new conduct by Ms. Porter (See Sections II.C. and II. D. above) which followed the September 2, 2009 stipulated restraining order justified the issuance of a domestic violence restraining order against Ms. Porter. To the extent that the court heard evidence about the two 2009 incidents, the evidence was admitted as relevant proof of Ms. Porter's motive and intent with regard to the two later events discussed in Sections II.C. and II.D. Under Evidence Code section 1101(b).

### 3.    Evidence of Mr. Aksu's Lack of Fear of Ms. Porter

Ms. Porter contends that Mr. Aksu's testimony at trial showed that he presently does not fear Ms. Porter. Ms. Porter claims that Mr. Aksu's lack of fear precludes the issuance of the requested restraining order. There is no case cited for the proposition that the putative victim must presently fear the alleged abuser before the court may issue a restraining order that seeks to protect against future abuse. Family Code section 6203 defines abuse that may be enjoined. It incorporates by reference into its definition a variety of acts that may be enjoined as provided in Family Code section 6320. While Family Code section 6203© provides a description of one of many kinds of abuse, its use of the term "reasonable apprehension" cannot be read to apply to all of the other forms of abuse for which a restraining order might be justified.

There is no statute that requires that the victim of abuse establish his/her general fear in relation to the abuser. The standard form DV-100 does not require a person seeking a temporary order to allege fear of the respondent as a condition to getting a temporary order.

Finally, the court notes that Mr. Aksu's testimony was not as unequivocal as the description of Ms. Porter suggests. His actual testimony at trial actually indicated that

while he had no fear of Ms. Porter in face-to-face situations, he was concerned about acts she might commit such as the acts she committed.

4.    The Court's Failure to Address Inconsistencies in the Evidence

In connection with her request for a statement of decision, counsel for Ms. Porter requests that this court address numerous evidentiary questions relating to her commission of the acts of abuse. Because this court has decided the dispositive issues in this case by applying the pertinent legal principles to the facts of this case, it is unnecessary for the court to make the various specific findings or clarifications sought by Ms. Porter's counsel. See *Vukovich v. Radulovich,* (1991) 235 Cal App. 3d 281, 295 (court only required to resolve issue or issues that are necessary to a proper decision). To put it another way, the court must identify and resolve the ultimate issues but is not required to make a determination as to each factual dispute as to which counsel would like an answer. See e.g. *Muzquiz v. City of Emeryville,* (2000) 79 Cal. App. 4th 1106, 1125-26. Counsel for Ms. Porter seems to contend that the court must make numerous findings on every inconsistency in the evidence. Surely, where the burden of proof is preponderance of the evidence there may be probative evidence that points in favor of both parties. In this case, the court simply finds that despite the conflicts in the evidence, Ms. Porter's proof established Ms. Porter's commission of the abusive conduct by a preponderance of the evidence. The court has reviewed each of Ms. Porter's observations about the alleged "defects" in the evidence and finds notwithstanding counsel's observations the proof was sufficient to satisfy Mr. Aksu's burden of proof. Having reached that conclusion, the court declines Ms. Porter's suggestion that the court respond to each and every specific factual dispute propounded in her objections/proposals as unnecessary to the resolution of the case.

16

5.    Delay of Trial Proceedings

Counsel for Ms. Porter suggests that this court should not issue a long-term restraining order because the temporary restraining order was in effect for an extended period prior to trial and such an order would be inconsistent with the legislative policy expressed in FC §6220. The language in FC §6220 appears to express dual goals. The first goal is to prevent recurrence of the perpetrator's acts. The second goal is to provide for a separation of the parties to permit them to address the causes of violence. Counsel for Ms. Porter seems to focus on the second part of the policy and neglect the first part.

Under FC §6345, the original long-term order can be issued for as long as five years. Furthermore, that initial order can be extended for five more years. Contrary to the suggestion of Ms. Porter's counsel, the statutory framework suggests that these orders are not necessarily issued solely to allow for short-term periods to allow the parties to cool off. The statute obviously contemplates long-term orders at least under certain circumstances. One of the sets of circumstances that might support a long-term order would be situations where the abusive behavior involved multiple acts occurring over an extended period of time. This case is just such a case.

In this case, the court is issuing a restraining order for three years even though Mr. Aksu has asked for the order to last a longer period. The court acknowledges that the length of the orders to be issued is not a precise calculation governed by precise guidelines. In the court's view, the three year period applicable to this court's order is sufficient to deter recurrences of Ms. Porter's bad behavior for an appropriate period.

6.    Objections to the Award of Attorney Fees

17

Ms. Porter objects to the award of attorney fees in several respects. First, Ms. Porter states that the court has failed to select the section under which attorney fees are ordered. To be precise, the court finds that attorney fees may be justified under both FC §271 and §6344.

Secondly, Ms. Porter asserts that the tentative decision does not take into account Ms. Porter's inability to pay any attorney fees. Both §271 and §6344, require that the court take into account the party's ability to pay the sanction imposed. It was for this reason that the court's tentative decision provided that the tentative decision was to serve as a notice to Ms. Porter giving her an opportunity to request a hearing on the attorney fee issue. Ms. Porter's objections do not explicitly request such a hearing but might be interpreted as such a request.

There will be a hearing conducted in this case on June 1, 2012. At that hearing, the court will address whether Ms. Porter wishes to request a hearing on the possible award of attorney fees.

B.    Mr. Aksu's Objections

Counsel for Mr. Aksu objects to certain parts of the court's proposed restraining order that accompanied the tentative decision. He objects to the three year period of the order. The court has reconsidered the three year term in light of Mr. Aksu's objection and still believes that the three year period is of sufficient length.

Mr. Aksu also objects to the proposed order's failure to order Ms. Porter to undergo a 52 week batterers' program. The court has considered this objection and denies it as well. In doing so, the court notes that its decision to issue an order to attend the 52 week program is committed to the court's discretion. In exercising its discretion, the court

notes that the two most recent occurrences which support the issuance of the restraining order did not involve the infliction of or the attempt to inflict physical harm on Mr. Aksu.

Mr. Aksu contends that the court neglected to state a number of persons and places as to whom/which the stay away provisions apply. The court notes that counsel for Mr. Aksu may have misread the full extent of the restraining orders set forth at Item #7 on the form DV-130. The court has considered each of the specific items requested by Mr. Aksu and determines that, in addition to the provisions set forth in the proposed retraining order that accompanied the tentative order, the following restrictions shall be included:

1.    At any exchanges of the child at a residence, the party delivering the son shall remain in his/her car and the party receiving the son shall remain in his/her residence during the exchange. The child shall walk to or from the car/residence without either parent accompanying the child.

2.    Ms. Porter shall remain 100 yards away from Mr. Aksu and his wife at whatever location they are vacationing provided Mr. Aksu provides reasonable advance notice of the dates and location of the vacation dates and locations.

3.    Ms. Porter shall remain at least 50 feet from Mr. Aksu and his wife Berna at any school event they are attending relating to the minor son of Mr. Aksu and Ms. Porter.

4.    Ms. Porter shall stay 100 yards away from the school that the minor son attends whenever the custody/visitation schedule set by the court in this case or otherwise agreed to by the parties' calls for Mr. Aksu or someone acting on his behalf to deliver or pick up the minor son to or from the school.

To the extent that Mr. Aksu asks the court to include other stay away provisions, the court denies those requests.

VI.    Conclusion

For the reasons stated above, this court finds that Ms. Porter has engaged in domestic violence and abuse and that a Domestic Violence Restraining Order lasting for a term of three years shall be issued. The terms of the restraining order are set forth in the attached standard DV-130 form and are incorporated by reference into this Tentative/Proposed Statement of Decision.

As noted above, these findings and orders constitute the court's Statement of Decision. At the scheduled June 1, 2012 hearing, the court will discuss with counsel for Ms. Porter whether Ms. Porter is requesting a hearing on the issue of attorney fees related to these proceedings as set forth above in Section IV.

Date: 5/31/12

Charles B. Burch
Superior Court Judge

SUPERIOR COURT – MARTINEZ
COUNTY OF CONTRA COSTA
MARTINEZ, CA 94553
(925) 646-2950

CLERK'S CERTIFICATE OF MAILING

CASE TITLE: ARDA AKSU vs SUZANNE AKSU
CASE NUMBER: MSD06-04997 – FAMILY LAW

THIS NOTICE/DOCUMENT HAS BEEN SENT TO THE FOLLOWING ATTORNEYS/PARTIES:

PETER D. LANGLEY                      PAMELA L MARRACCINI
611 LAS JUNTAS STREET                 1225 ALPINE RD #204
P.O. BOX 630                          WALNUT CREEK CA 94596
MARTINEZ CA 94533

I am a Clerk of the Court indicated below and am not a party to this
cause. On the date below indicated, I served a copy of the
attached document(s) by depositing a true copy in the mail in a
sealed envelope with postage prepaid, at Martinez, California
addressed as above indicated.

TITLE OF DOCUMENT SERVED:  ORDER ON STATEMENT OF DECISION RE DV

DATE MAILED:  05/31/12              CLERK OF THE COURT
                                   BY
                                   K. CASILLAS, Deputy Clerk

**DV-130** **Restraining Order After Hearing**
**(Order of Protection)**

*Clerk stamps date here when form is filed.*

F I L E D

MAY 3 1 2012

K. TORRE, CLERK OF THE COURT
SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF CONTRA COSTA
By _____ , Deputy Clerk

**(1) Name of Protected Person:**

ARDA AKSU

Your lawyer in this case *(if you have one):*

Name: PETER D. LANGLEY _____ State Bar No.: 53945 .

Firm Name: GORDON, WATROUS, RYAN, LANGLEY, ET AL.

**Address** *(If you have a lawyer for this case, give your lawyer's information. If you do not have a lawyer and want to keep your home address private, give a different mailing address instead. You do not have to give your telephone, fax, or e-mail.):*

Address: 611 LAS JUNTAS ST

City: MARTINEZ, _____ State: CA _____ Zip: 94553

Telephone: 925 228-1400 _____ Fax: _____

E-Mail Address: _____

*Fill in court name and street address:*

Superior Court of California, County of
CONTRA COSTA
751 PINE STREET
PO BOX 911
MARTINEZ, CA 94553

*Fill in case number:*

**Case Number:**
MSD06-04997

**(2) Name of Restrained Person:**

SUZANNE PORTER

**Description of restrained person:**

Sex: ☐ M ☒ F Height: 5'10 _____ Weight: 200 LBS _____ Hair Color: BROWN _____ Eye Color: BROWN

Race: CAUCASION _____ Age: 42 _____ Date of Birth: 05/21/1970

Mailing Address *(if known):* 210 F STREET

City: MARTINEZ _____ State: CA _____ Zip: 94553

Relationship to protected person: PREVIOUSLY MARRIED WITH CHILD

**(3) ☒ Additional Protected Persons**

In addition to the person named in **(1)**, the following persons are protected by orders as indicated in item **(6)** and **(7)** *(family or household members):*

| Full name | Relationship to person in (1) | Sex | Age |
|---|---|---|---|
| BERNA POLAT AKSU | SPOUSE | F | 42 |
| | | | |
| | | | |

☐ *Check here if there are additional protected persons. List them on an attached sheet of paper and write, "DV-130, Additional Protected Persons" as a title.*

**(4) Expiration Date**

The orders, except as noted below, end on

*(date):* 5/31/2015 _____ at *(time):* _____ ☐ a.m. ☐ p.m. or ☒ midnight

- *If no date is written, the restraining order ends three years after the date of the hearing in item **(5)** (a).*
- *If no time is written, the restraining order ends at midnight on the expiration date.*
- *Note: Custody, visitation, child support, and spousal support orders remain in effect after the restraining order ends. Custody, visitation and child support orders usually end when the child is 18.*
- *The court orders are on pages 2, 3, 4 and 5 and attachment pages (if any).*

**This order complies with VAWA and shall be enforced throughout the United States. See page 5.**

**This is a Court Order.**

Judicial Council of California, www.courts.ca.gov
Revised January 1, 2012, Mandatory Form
Family Code, § 6200 et seq.
Approved by DOJ

Martin-Dean
ESSENTIAL FORMS™

**Restraining Order After Hearing (CLETS—OAH)**
**(Order of Protection)**
(Domestic Violence Prevention)

DV-130, Page 1 of 6
→

**Case Number:**
MSD06-04997

**⑤ Hearings**    ORDER ON STATEMENT OF DECISION AFTER COURT TRIAL

a.  The hearing was on *(date):* _____ with *(name of judicial officer):* CHARLES B. BURCH

b.  These people were at the hearing *(check all that apply):*
☐ The person in ① ☐ The lawyer for the person in ① *(name).* _____
☐ The person in ② ☐ The lawyer for the person in ② *(name):* _____

c.  ☐ The person in ① or ② must **return to court** on *(date):* _____ , _____
at *(time):* _____    ☐ a.m. ☐ p.m.  to review *(specify issues):* _____

_____

---

## To the person in ②

**The court has granted the orders checked below. Item ⑨ is also an order. If you do not obey these orders, you can be arrested and charged with a crime. You may be sent to jail for up to one year, pay a fine of up to $1,000, or both.**

**⑥ ☒ Personal Conduct Orders**

a.  The person in ② must **not** do the following things to the protected people in ① and ③ :
☒ Harass, attack, strike, threaten, assault (sexually or otherwise), hit, follow, stalk, molest, destroy personal property, disturb the peace, keep under surveillance, or block movements.
☒ Contact, either directly or indirectly, by any means, including, but not limited to, by telephone, mail, e-mail or other electronic means.
☒ Take any action, directly or through others, to obtain the addresses or locations of any protected persons. *(If this item is not checked, the court has found good cause not to make this order.)*

b.  Peaceful written contact through a lawyer or process server or another person as needed to serve legal paper is allowed and does not violate this order.

c.  ☒ Exceptions: Brief and peaceful contact with the person in ①, and peaceful contact with children in ③, as required for court-ordered visitation of children, is allowed unless a criminal protective order says otherwise.

**⑦ ☒ Stay-Away Order**

a.  The person in ② must stay at least *(specify):* 100 yards away from:
☒ The person in ①                    ☒ School of person in ①
☒ The persons in ③                   ☒ The children's school or child care
☒ Home of person in ①                ☒ Other *(specify):* _____
☒ The job or workplace of person in ①    SEE ADDITIONAL ORDER FINAL PAGE HEREIN RE
☒ Vehicle of person in ①             CHILD'S SCHOOL, EXCHANGES OF CHILD AND OTHER

b.  ☒ Exceptions: Brief and peaceful contact with the person in ①, and peaceful contact with children in ③, as required for court-ordered visitation of children, is allowed unless a criminal protective order says otherwise.

**⑧ ☐ Move-Out Order**

The person in ② must move out immediately from *(address):* _____

_____

---

## This is a Court Order.


Revised January 1, 2012
Judicial Council
Essential Forms™

**Restraining Order After Hearing (CLETS—OAH)**
**(Order of Protection)**
**(Domestic Violence Prevention)**

DV-130, Page 2 of 6
→

Case Number:
MSD06-04997

**9** No Guns or Other Firearms or Ammunition

a. The person in (2) cannot own, possess, have, buy or try to buy, receive or try to receive, or in any other way get guns, other firearms, or ammunition.

b. The person in (2) must:
- Sell to a licensed gun dealer or turn in to a law enforcement agency any guns or other firearms within his or her immediate possession or control. This must be done within 24 hours of being served with this order.
- File a receipt with the court within 48 hours of receiving this order that proves guns have been turned in or sold. *(Form DV-800*, Proof of Firearms Turned In or Sold, *may be used for the receipt.)*

c. ☐ The court has received information that the person in (2) owns or possesses a firearm.

**10** Record Unlawful Communications

The person in (1) has the right to record communications made by the person in (2) that violate the judge's orders.

**11** Animals: Possession and Stay-Away

The person in (1) is given the sole possession, care, and control of the animals listed below. The person in (2) must stay at least _____ yards away from and not take, sell, transfer, encumber, conceal, molest, attack, strike, threaten, harm, or otherwise dispose of the following animals:_____

_____

**12** ☐ Child Custody and Visitation

Child custody and visitation are ordered on the attached Form DV-140, *Child Custody and Visitation Order* or *(specify other form)*: _____

**13** ☐ Child Support

Child support is ordered on the attached Form FL-342, *Child Support Information and Order Attachment* or *(specify other form)*. _____

**14** ☐ Property Control

Only the person in (1) can use, control, and possess the following property:_____

_____

**15** ☐ Debt Payment

The person in (2) must make these payments until this order ends:

Pay to: _____ For: _____ Amount: $_____ Due date: _____

Pay to: _____ For: _____ Amount: $_____ Due date: _____

Pay to: _____ For: _____ Amount: $_____ Due date: _____

☐ *Check here if more payments ordered. Attach a sheet of paper and write, "DV-130, Debt Payments" as a title.*

**16** ☐ Property Restraint

The ☐ person in (1) ☐ person in (2) must not transfer, borrow against, sell, hide, or get rid of or destroy any property, including animals, except in the usual course of business or for necessities of life. In addition, the person must notify the other of any new or big expenses and explain them to the court. *(The person in (2) cannot contact the person in (1) if the court has made a "Personal Conduct" order.)*

Peaceful written contact through a lawyer or a process server or other person for service of legal papers related to a court case is allowed and does not violate this order.

**This is a Court Order.**

Mardin Dean's
ESSENTIAL FORMS™

**Restraining Order After Hearing (CLETS—ROAH)**
**(Order of Protection)**
**(Domestic Violence Prevention)**

| Case Number: |
|---|
| MSD06-04997 |

**(17) ☐ Spousal Support**

Spousal support is ordered on the attached Form FL-343, *Spousal, Partner, or Family Support Order Attachment* or (specify other form): _____

**(18) ☐ Lawyer's Fees and Costs**

The person in ② must pay the following lawyer's fees and costs:

Pay to: _____ For: _____ Amount: $_____ Due date: _____

Pay to: _____ For: _____ Amount: $_____ Due date: _____

**(19) ☐ Payments for Costs and Services**

The person in ② must pay the following:

Pay to: _____ For: _____ Amount: $_____ Due date: _____

Pay to: _____ For: _____ Amount: $_____ Due date: _____

Pay to: _____ For: _____ Amount: $_____ Due date: _____

☐ *Check here if more payments ordered. Attach a sheet of paper and write, "DV-130, Payments for Costs and Services" as a title.*

**(20) ☐ Batterer Intervention Program**

The person in ② must go to and pay for a 52-week batterer intervention program and show written proof of completion to the court. This program must be approved by the probation department.

**(21) ☒ Other Orders**

Other orders (specify): SEE ATTACHED PAGE FOR ADDITIONAL ORDER REGARDING STAY AWAY.

_____

**(22) No Fee to Serve (Notify) Restrained Person**

If the sheriff or marshal serves this order, he or she will do it for free.

**(23) Service**

a. ☒ The people in ① and ② were at the hearing or agreed in writing to this order. No other proof of service is needed.

b. ☐ The person in ① was at the hearing. The person in ② was not.

   (1) ☐ Proof of service of Form DV-109 and Form DV-110 (if issued) was presented to the court. The judge's orders in this form are the same as in Form DV-110 except for the end date. The person in ② must be served. This order can be served by mail.

   (2) ☐ Proof of service of Form DV-109 and Form DV-110 (if issued) was presented to the court. The judge's orders in this form are different from the orders in Form DV-110, or Form DV-110 was not issued. Someone—not the people in ① or ③ —must personally "serve" a copy of this order to the person in ②.

**(24) ☐ Criminal Protective Order**

a. ☐ Form CR-160, *Criminal Protective Order—Domestic Violence*, is in effect.

   Case Number: _____ County: _____ Expiration Date: _____

   *(If more orders, list them on extra sheet of paper and write, "DV-130, Other Criminal Protective Orders" as a title.)*

b. ☐ No information has been provided to the judge about a criminal protective order.

**This is a Court Order.**

Revised January 1, 2012
Marin Legal
ESSENTIAL FORMS

**Restraining Order After Hearing (CLETS—OAH)**
**(Order of Protection)**
**(Domestic Violence Prevention)**

DV-130, Page 4 of 6
→

Case Number:

## Arrest Required If Order Is Violated

If an officer has probable cause to believe that the restrained person had notice of the order and has disobeyed the order, the officer must arrest the restrained person. (Penal Code, §§ 836(c)(1), 13701(b).) A violation of the order may be a violation of Penal Code section 166 or 273.6.

## Notice/Proof of Service

Law enforcement must first determine if the restrained person had notice of the orders. If notice cannot be verified, the restrained person must be advised of the terms of the orders. If the restrained person then fails to obey the orders, the officer must enforce them. (Family Code, § 6383.)

Consider the restrained person "served" (noticed) if:

- The officer sees a copy of the *Proof of Service* or confirms that the *Proof of Service* is on file; *or*
- The restrained person was at the restraining order hearing or was informed of the order by an officer. (Fam. Code, § 6383; Pen. Code, § 836(c)(2).) An officer can obtain information about the contents of the order in the Domestic Violence Restraining Orders System (DVROS). (Fam. Code, § 6381(b)(c).)

## If the Protected Person Contacts the Restrained Person

Even if the protected person invites or consents to contact with the restrained person, the orders remain in effect and must be enforced. The protected person cannot be arrested for inviting or consenting to contact with the restrained person. The orders can be changed only by another court order. (Pen. Code, §13710(b).)

## Child Custody and Visitation

- The custody and visitation orders are on Form DV-140, items ③and ④ . They are sometimes also written on additional pages or referenced in DV-140 or other orders that are not part of the restraining order.
- **Forms DV-100 and DV-105 are not orders. Do not enforce them**

## Enforcing the Restraining Order in California

Any law enforcement officer in California who receives, sees, or verifies the orders on a paper copy, the California Law Enforcement Telecommunications System (CLETS), or in an NCIC Protection Order File must enforce the orders.

## Conflicting Orders

A protective order issued in a criminal case on Form CR-160 takes precedence in enforcement over any conflicting civil court order. (Pen. Code, § 136.2(e)(2).) Any nonconflicting terms of the civil restraining order remain in full force. An emergency protective order (Form EPO-001) that is in effect between the same parties and is more restrictive than other restraining orders takes precedence over all other restraining orders. (Pen. Code, § 136.2.)

---

*(Clerk will fill out this part.)*

### —Clerk's Certificate—

*Clerk's Certificate*
*[seal]*

I certify that this *Restraining Order After Hearing (Order of Protection)* is a true and correct copy of the original on file in the court.

Date: _____ Clerk, by _____ , Deputy



**This is a Court Order.**



Case Number:
MS 06-04997

(25) ☒ **Attached pages are orders.**
- Number of pages attached to this six-page form: 1
- All of the attached pages are part of this order.
- Attachments include *(check all that apply)*:
  ☐DV-140   ☐DV-145   ☐DV-150   ☐FL-342   ☐FL-343
  ☒Other *(specify)*: ADDITIONAL ORDERS

Date: 5/31/2012

*Charles B Burch*

*Judge (or Judicial Officer)* CHARLES B. BURCH

### Certificate of Compliance With VAWA

This restraining (protective) order meets all "full faith and credit" requirements of the Violence Against Women Act, 18 U.S.C. § 2265 (1994) (VAWA) upon notice of the restrained person. This court has jurisdiction over the parties and the subject matter; the restrained person has been or will be afforded notice and a timely opportunity to be heard as provided by the laws of this jurisdiction. **This order is valid and entitled to enforcement in each jurisdiction throughout the 50 states of the United States, the District of Columbia, all tribal lands, and all U.S. territories,** commonwealths, and possessions and shall be enforced as if it were an order of that jurisdiction.

## Warnings and Notices to the Restrained Person in ②

### If you do not obey this order, you can be arrested and charged with a crime.
- If you do not obey this order, you can go to jail or prison and/or pay a fine.
- It is a felony to take or hide a child in violation of this order.
- If you travel to another state or to tribal lands or make the protected person do so, with the intention of disobeying this order, you can be charged with a federal crime.

### You cannot have guns, firearms, and/or ammunition.



You cannot own, have, possess, buy or try to buy, receive or try to receive, or otherwise get guns, other firearms, and/or ammunition while the order is in effect. **If you do, you can go to jail and pay a $1,000 fine. You must sell to a licensed gun dealer or turn in to a law enforcement agency any guns or other firearms that you have or control. The judge will ask you for proof that you did so. If you do not obey this order, you can be charged with a crime.** Federal law says you cannot have guns or ammunition while the order is in effect.

### Instructions for Law Enforcement

#### Start Date and End Date of Orders
The orders *start* on the earlier of the following dates:
- The hearing date in item ⑤ (a) on page 2 or
- The date next to the judge's signature on this page.

The orders *end* on the expiration date in item ④ on page 1. If no date is listed, they end three years from the hearing date.

### This is a Court Order.


Revised January 1, 2012
Judicial Council
ESSENTIAL FORMS™

**Restraining Order After Hearing (CLETS—OAH)**
**(Order of Protection)**
(Domestic Violence Prevention)

DV-130, Page 5 of 6
→

1.    At any exchanges of the child at a residence, the party delivering the son shall remain in his/her car and the party receiving the son shall remain in his/her residence during the exchange. The child shall walk to or from the car/residence without either parent accompanying the child.

2.    Ms. Porter shall remain 100 yards away from Mr. Aksu and his wife at whatever location they are vacationing provided Mr. Aksu provides reasonable advance notice of the dates and location of the vacation dates and locations.

3.    Ms. Porter shall remain at least 50 feet from Mr. Aksu and his wife Berna at any school event they are attending relating to the minor son of Mr. Aksu and Ms. Porter.

4.    Ms. Porter shall stay 100 yards away from the school that the minor son attends whenever the custody/visitation schedule set by the court in this case or otherwise agreed to by the parties' calls for Mr. Aksu or someone acting on his behalf to deliver or pick up the minor son to or from the school.

# EXHIBIT B

COUNTY(TIES) Contra Costa County, STATE OF CALIFORNIA

## SEARCH WARRANT No. M11 - 128

**The People of the State of California**, to any sheriff, constable, marshal, police officer or peace officer in the county(ties) of Contra Costa County: PROOF by affidavit having been made before me this day by Sergeant Detective J. Vorhauer that there is probable cause to believe the **property** and/or **thing(s)** and/or **person(s)** described herein may be found at the location(s) set forth and that the following provisions of California Penal Code Section 1524 are applicable:

☐ The property was stolen or embezzled - Penal Code 1524(a)(1).

☒ The property or thing(s) were used as the means of committing a felony - Penal Code 1524(a)(2).

☒ The property or thing(s) are in the possession of any person with the intent to use it as a means of committing a public offense; OR are in the possession of another to whom he or she may have delivered it for the purpose of concealing it or preventing it from being discovered - Penal Code 1524(a)(3).

☒ The property or thing(s) consist of any item or constitutes any evidence that tends to show a felony has been committed or tends to show that a particular person has committed a felony - Penal Code 1524(a)(4).

☐ The property or things consist of evidence which tends to show that sexual exploitation of a child in violation of Section 311.3, or possession of matter depicting sexual conduct of a person under the age of 18 years in violation of 311.11, has occurred or is occurring - Penal Code 1524(a)(5).

☐ An arrest warrant is outstanding for the person to be seized - Penal Code 1524(a)(6).

☐ Because this is a search for documentary evidence which is in the possession or under the control of a lawyer, physician, psychotherapist or clergyman who is not a suspect in the criminal activity to which the documentary evidence being sought relates, the Special Master provisions are applicable - Penal Code 1524(c).

## YOU ARE THEREFORE COMMANDED TO SEARCH:

**THE PREMISES** located at and described as:

1872 Green Valley Road, Alamo, California, 94507 further described as a single-story dwelling house with a black composite roof and tan wood exterior, and white trim. Additionally, the residence is surrounded by a natural colored wood fence. The numbers 1872 are affixed vertically to the pedestrian gate leading to the front entrance of the residence. The search of the residence is to include all rooms, attics, basements, and other parts therein; the surrounding grounds and any garages, storage rooms, trash containers, and outbuildings of any kind located thereon which could contain any of the items sought.

The Premises includes basements, attics, appurtenant buildings, the surrounding grounds, and all containers therein and thereon which could contain any of the items sought.

**THE CONTAINER(S)** located at and described as:

**THE VEHICLE(S)** described as: Any and all vehicles found to be under the care, dominion and or control of the residents, as evidence by titles, registrations, and releases of liabilities, keys or other documentation. Including the passenger compartment, storage areas such as the trunk and glove compartment, and any containers within the vehicles(s) and or vessels(s) which could contain any of the items sought

The vehicle includes the passenger compartment, storage areas such as the trunk and glove box, and any container within the vehicle(s) which could contain any of the items sought.

**THE PERSON(S)** of: Tanabe, Stephen R, Adult Asian Male, DOB 6/15/1963, DL# B6289363, Hair: Black, Eyes: Brown, HGT: 511, WGT, 240

## FOR THE FOLLOWING PROPERTY, THING(S) and/or PERSON(S)

☐  Listed in Exhibit # _____, attached.

☒  Listed below:

1. (2) saliva buccal DNA samples of saliva from the inside of the mouth of Stephen R Tanabe, DOB 6/15/1963. The samples are to be collected by investigators. The officer serving this search warrant is authorized by the court to inform Stephen R Tanabe that he has no legal right to refuse to submit to this search warrant. If Stephen R Tanabe resists, the court hereby authorizes the officer to use reasonable force which does not shock the conscience to obtain the evidence as long as the collection of the evidence is done in a medically approved manner. Stephen R Tanabe may also be advised that he has no legal right to have an attorney present during the service of this search warrant and may not refused or impeded the service of this search warrant because an attorney is not present.

2. Indicia such as mail, bank statements, keys, documents, etc. that would tend to prove who resides or occasionally occupies the place being searched.

3. To search/seize the contents and cellular phone (925-565-1588) belonging to Stephen R Tanabe for all information stored to include records of all stored contacts and telephone numbers, all placed telephone calls, all missed telephone calls, all sms/text messages and all images files.

4. Any and all firearms/weapons that by their nature is illegal to posses.

SEARCH WARRANT - PAGE 2

5.    All electronic data processing and storage devices, computers and computer systems, such as central processing units, internal and peripheral storage devices such as fixed disks, internal and external hard drives, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, dongles, encryption keys, personal data assistants (PDA's) or other memory storage devices; and any/all peripheral input/output devices such as keyboards, printers, video display monitors, optical readers and related communication devices such as modems, associated telephone sets, speed dialers, and/or other controlling devices, plotters, software to run programs, connecting cables and plugs, peripherals such as joysticks, mousses, or other input devices, scanners, writing pads, manuals, connecting switches, telephones and telephone cables, and interface devices; system documentation, operating logs and documentation, software and instructional manuals. Computing or data processing software, stored on any type of medium such as: hard disks, floppy disks, CD-R's, CD-RW's, DVD's, cassette tapes, or other permanent or transient storage medium. Any records, whether stored on paper, on magnetic media such as tape, cassette, disk, diskette or on memory storage devices such as optical disks, programmable instruments such as telephones, "electronic calendar\address books" calculators, or any other storage media, together with indicia of use, ownership, possession, or control of such records. Any written or computer communication in printed or stored medium such as E-Mail and Chat Logs whether in active files, deleted files or unallocated space on the hard drive, floppy drive or any data storage media. Search of all of the above items is for files, data, images, software, operating systems, deleted files, altered files, system configurations, drive and disk configurations, date and time, and unallocated and slack space, for evidence. With respect to computer systems and any items listed above found during the execution with this Search Warrant, the searching Peace Officers are authorized to seize and book said computer systems and any items listed above and transfer them to a Law Enforcement Agency location prior to commencing the search of the items. Furthermore, said search may continue beyond the ten-day period beginning upon issuance of this Search Warrant, to the extent necessary to complete the search on the computer systems and any items listed above.

6.    Peace Officers during the execution of this Search Warrant may answer telephones and converse with callers at the location of this Search Warrant without revealing the Peace Officers true identity, and note and/or record any conversations and information received from the telephone calls, including caller identification information.

and to seize such person(s), and/or property and/or things or any part thereof and to retain such property and/or thing(s) in your custody subject to order of a competent court pursuant to Penal Code section 1536.

**NIGHT-TIME Service:** Good cause having been shown by **Affidavit**, you may serve this warrant at any time of the day or night when my initials are here ⟶ *R.E.A. Jud*

GIVEN under my hand this _4/66_ day of _March_, 20_11_, at _1:15_ AM ☒PM.

_____   Judge of the _Superior_ Court
Magistrate's Signature                                          Name (level) of Court

RICHARD E. ARNASON
Judicial District if Applicable

## COUNTY OF CONTRA COSTA, STATE OF CALIFORNIA

### RETURN TO SEARCH WARRANT

No. MII-128

The property or things listed below (or on the attachment hereto) was taken from

1872 GREEN VALLEY ROAD  ALAMO _____ pursuant to the Search Warrant dated the

4 day of _____ MARCH _____, to 2011, issued by Judge ARNASON

- DELL VOSTRO 200 COMPUTER SER# JB5Q1F1
- WESTERN DIGITAL HARD DRIVE ──────── DINING ROOM HUTCH
- DELL LAPTOP COMPUTER INSPIRON 6000, UNK SER#
- VERIZON LG CELL PHONE (PURPLE) - MASTER BED ROOM
- DELL STUDIO 1555 LAPTOP COMPUTER - SONS ROOM
- ~~VERIZON ~~~ ~~THUMB DRIVE~~
- MOTOROLA CELL PHONE (925-505-1588) - SILVER DODGE TRUCK
- GARMIN NUVI 200 GPS SERIAL 19A305580 - SILVER DODGE TRUCK
- INDICIA (PAY STUB, PGE BILL)

FILED
2011 MAR -7 P 12: 30

_____ In addition to the above-listed items, the seizure of which was commanded by the Search Warrant, other items were seized which were not listed on the Search Warrant. A listing of them is attached hereto.

I, PAUL BEARD _____ (print name) by whom this Warrant was served, do swear that the above and/or the attached inventory/inventories contain(s) a true and detailed account of all the property taken during the service of this Search Warrant.

All the property seized which was listed on the Search Warrant will be retained in my custody subject to order of this or any other court in which the offense in respect to which the property was taken is triable.

Signed in Presence of Issuing Judge

GIVEN under my hand and dated
this ___7th___ day of ___March___ 20 11

Judge

Judge of the _____ SUPERIOR _____ Court, _____ COUNTY OF CONTRA COSTA

- Leave 1 copy at place searched
- Within 10 days of ISSUANCE of Warrant, swear to original before issuing Judge who will file with Clerk;
- 1 copy for police file

Page 1 of 2

## RETURN TO SEARCH WARRANT
List seized items named on search warrant

## COUNTY OF CONTRA COSTA, STATE OF CALIFORNIA

### RECEIPT FOR PROPERTY SEIZED

No. M11-125

The following items, which constitute Evidence of Crime, Contraband, or Stolen Property, were discovered in plain view while searching for items listed on the Search Warrant which was being served at ~~1872 VALLEY~~

1872 GREEN VALLEY ROAD ALAMO California, on _____ MARCH 4, 20 11

- GLOCK 19 9mm SER # PPU621 - GUN SAFE IN MASTER CLOSET

- SIG 239 9mm SER # SA 138 782 OE

- REMINGTON 870 SHOTGUN SER # SH 340 52 V

P. BEARD 46503          3-4-11

Officer's Name          Date

- Leave 1 copy at place searched
- ORIGINAL WITH SEARCH WARRANT AND RETURN TO JUDGE
- 1 copy for police file

Page 2 of 2

## RECEIPT FOR PROPERTY SEIZED

List seized items not named on search warrant

COUNTY OF CONTRA COSTA , STATE OF .LIFORNIA

AFFIDAVIT FOR SEARCH WARRANT No. M11 - 12 ⊗

☐ ↳And, AFFIDAVIT FOR RAMEY ARREST WARRANT (817 P.C.)
Mark If Applicable

On the basis of her personal knowledge, and on the basis of other information contained in the attachments hereto, *Sergeant Detective Jason Vorhauer* being duly sworn, deposes and says that there is probable cause to believe the property and/or person(s) described herein may be found at the location(s) set forth. And, that the following provisions of California Penal Code Section 1524 are applicable:

☐ The property was stolen or embezzled - Penal Code 1524(a)(1).

☒ The property or thing(s) were used as the means of committing a felony - Penal Code 1524(a)(2).

☒ The property or thing(s) are in the possession of any person with the intent to use it as a means of committing a public offense; OR are in the possession of another to whom he or she may have delivered it for the purpose of concealing it or preventing it from being discovered - Penal Code 1524(a)(3).

☒ The property or thing(s) consist of any item or constitutes any evidence that tends to show a felony has been committed or tends to show that a particular person has committed a felony - Penal Code 1524(a)(4).

☐ The property or things consist of evidence which tends to show that sexual exploitation of a child in violation of Section 311.3, or possession of matter depicting sexual conduct of a person under the age of 18 years in violation of 311.11, has occurred or is occurring - Penal Code 1524(a)(5).

☐ An arrest warrant is outstanding for the person to be seized - Penal Code 1524(a)(6).

☐ Because this is a search for documentary evidence which is in the possession or under the control of a lawyer, physician, psychotherapist or clergyman who is not a suspect in the criminal activity to which the documentary evidence being sought relates, the Special Master provisions are applicable - Penal Code 1524(c).

and requests the issuance of a warrant to search:

**THE PREMISES** located at and described as: 1872 Green Valley Road,   Alamo,   California,   94507 further described as a single-story dwelling house with a black composite roof and tan wood exterior, and white trim.   Additionally, the residence is surrounded by a natural colored wood fence.   The numbers 1872 are affixed vertically to the pedestrian gate leading to the front entrance of the residence. The search of the residence is to include all rooms, attics, basements, and other parts therein; the surrounding grounds and any garages, storage rooms, trash containers, and outbuildings of any kind located thereon which could contain any of the items sought.

containers therein and thereon    ch could contain any of the items ught.

**THE CONTAINER(S)** located at and described as:

**THE VEHICLE(S)** described as: Any and all vehicles found to be under the care, dominion and or control of the residents, as evidence by titles, registrations, and releases of liabilities, keys or other documentation. Including the passenger compartment, storage areas such as the trunk and glove compartment, and any containers within the vehicles(s) and or vessels(s which could contain any of the items sought

The vehicle includes the passenger compartment, storage areas such as the trunk and glove box, and any container within the vehicle(s) which could contain any of the items sought.

**THE PERSON(S)** of: Tanabe, Stephen R, Adult Asian Male, DOB 6/15/1963, DL# B6289363 Hair: Black, Eyes: Brown, HGT: 511, WGT, 240

FOR THE FOLLOWING **PROPERTY, THINGS** AND/OR **PERSON(S)**

☐ Listed in Exhibit        , attached
☒ Listed below

1.    (2) saliva buccal DNA samples of saliva from the inside of the mouth of Stephen R Tanabe, DOB 6/15/1963. The samples are to be collected by investigators. The officer serving this search warrant is authorized by the court to inform Stephen R Tanabe that he has no legal right to refuse to submit to this search warrant. If Stephen R Tanabe resists, the court hereby authorizes the officer to use reasonable force which does not shock the conscience to obtain the evidence as long as the collection of the evidence is done in a medically approved manner. Stephen R Tanabe may also be advised that he has no lega right to have an attorney present during the service of this search warrant and may not refused or impeded the service of this search warrant because an attorney is not present.

2.    Indicia such as mail, bank statements, keys, documents, etc. that would tend to prove who resides or occasionally occupies the place being searched.

3.    To search/seize the contents and cellular phone (925-565-1588) belonging to Stephen R Tanabe for all information stored to include records of all stored contacts and telephone numbers, all placed telephone calls, all missed telephone calls, all sms/text messages and all images files.

4.    Any and all firearms/weapons that by their nature is illegal to posses.

5.    All electronic data processing and storage devices, computers and computer systems, such as central processing units, internal and peripheral storage devices such as fixed disks, internal and external hard drives, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, dongles, encryption keys, personal data assistants (PDA's) or other memory storage devices; and any/all peripheral input/output devices such as keyboards, printers, video display monitors, optical readers and related communication devices such as modems, associated telephone sets, speed dialers, and/or other controlling devices, plotters, software to run programs, connecting cables

interface devices, system documentation, operating logs and documentation, software and instructional manuals. Computing or data processing software, stored on any type of medium such as: hard disks, floppy disks, CD-R's, CD-RW's, DVD's, cassette tapes, or other permanent or transient storage medium. Any records, whether stored on paper, on magnetic media such as tape, cassette, disk, diskette or on memory storage devices such as optical disks, programmable instruments such as telephones, "electronic calendar\address books" calculators, or any other storage media, together with indicia of use, ownership, possession, or control of such records. Any written or computer communication in printed or stored medium such as E-Mail and Chat Logs whether in active files, deleted files or unallocated space on the hard drive, floppy drive or any data storage media. Search of all of the above items is for files, data, images, software, operating systems, deleted files, altered files, system configurations, drive and disk configurations, date and time, and unallocated and slack space, for evidence. With respect to computer systems and any items listed above found during the execution with this Search Warrant, the searching Peace Officers are authorized to seize and book said computer systems and any items listed above and transfer them to a Law Enforcement Agency location prior to commencing the search of the items. Furthermore, said search may continue beyond the ten-day period beginning upon issuance of this Search Warrant, to the extent necessary to complete the search on the computer systems and any items listed above.

6. Peace Officers during the execution of this Search Warrant may answer telephones and converse with callers at the location of this Search Warrant without revealing the Peace Officers true identity, and note and/or record any conversations and information received from the telephone calls, including caller identification information.

The Attachments indicated below are incorporated into this Affidavit by reference and by physical attachment as though set forth here word-for-word; probable cause contained in:

☒ Narrative Statement of Probable Cause:

# Statement of Probable Cause

Affiant Sergeant Detective Jason Vorhauer is a Peace Officer with the Contra Costa County Sheriff's Office and has been so employed for over ten years. Affiant is currently assigned to the General Investigations Unit.

On February 23, 2011 at approximately 1500 hours, I conducted an interview with Reserve/Per Diem Deputy William Howard. Howard wanted to speak to me about the recent arrest of CNET Commander Norm Wellch and Private Investigator Christopher Butler for Narcotics trafficking.

Howard said that he had information about current Contra Costa County Sheriff Deputy Stephen Tanabe. Howard believed Tanabe could be involved in some possible illegal activity with Butler.

Howard stated in substance that he had met Tanabe while working as a per-diem Deputy in our Court Services Division. Howard said that he has also worked a few shifts with Tanabe on patrol in the City of Danville. Howard stated that he and Tanabe have a casual/friendly/business relationship.

Howard said that on January 14, 2011, he was on patrol with Tanabe in the City of Danville. Howard said that during this shift Tanabe received approximately eight to ten personal cell

phone calls from someone Tanabe identified as his "PI friend". The "PI friend" was later identified as Christopher Butler by Tanabe. Howard said during these phone calls, it appeared Deputy Tanabe was receiving updates about an individual, who was later identified as Mitchell Katz, who was currently drinking alcoholic beverages at a wine bar (The Vine). Howard said he could only hear Tanabe's side of the conversation but it appeared Butler was giving him updated information relating to Katz's sobriety.

As the conversation continued, Butler gave Tanabe a description of the vehicle Katz would be driving once he left the bar. Tanabe drove around the immediate vicinity of the bar and located a white pickup truck that was being described by Butler as belonging to Katz. Additionally, while driving past the bar Tanabe asked Butler if that was him in the Hummer parked next to the bar. As Tanabe drove by the Hummer, Howard could see that the Hummer was occupied by a male subject (When Butler was arrested by DOJ a Hummer belonging to Butler was seized).

Howard said that after locating the white pickup truck, Tanabe found a location close to the vehicle in which he could hide his police vehicle and watch the pickup. Howard said a short time later Katz came out of the bar and approached the pickup. Howard said that Tanabe confirmed with Butler that the individual at the pickup was the intended target. Katz then got into the pickup and drove a short distance and then parked the vehicle a short distance from the bar. Katz got out of the pickup and went back into the bar. After a short wait Katz again exited the bar and got into his pickup truck and drove away.

At some point during this event Howard asked Tanabe what was going on. Tanabe told him they were about to conduct a "Dirty DUI" stop on Katz.

According to Howard, as Katz drove away Tanabe pulled in behind Katz and followed Katz for a short period of time. At some point while they were following the pickup, Katz made a right hand turn without signaling. Tanabe conducted a traffic enforcement stop based on this probable cause, according to Howard.

Tanabe conducted a DUI investigation and subsequently arrested Katz for driving under the influence of an alcoholic beverage (Sheriffs DR#11-824).

Shortly after processing Katz at the Danville Police Station he was transported to the Martinez Detention Facility. While discussing the arrest of Katz, Howard told Tanabe that he felt sorry for Katz because just before the arrest Katz was in the bar discussing a deal to be featured in a reality show. Howard felt that this arrest might affect Katz's chances of getting a show. Tanabe told Howard not to worry about because the whole thing was a "set up". Tanabe did not explain to Howard what "set up" meant. Additionally, Tanabe said that the incident occurred because Katz needed to be "dirtied" up for a future court date. Howard felt uncomfortable with the arrest but because of his inexperience did not question the incident.

On February 16, 2011(The day Wielch and Butler were arrested) at approximately 2000 hours, Tanabe called Deputy Howard at his residence. Tanabe asked Howard if he was going to be home and asked Howard if he could come over and visit. Howard agreed to meet with Tanabe. Howard said that he could tell that something was bothering Tanabe.

When Tanabe arrived he asked Howard if he had been watching the news about Wielch and Butler's arrest. Howard told Tanabe that he had not watched the news yet. Tanabe went on to tell Howard about the arrest of Wielch and Butler. Tanabe said that he felt that his phone


1 98                              AFFIDAVIT - PAGE 4

was probably "bugged" because of his personal relationship with Butler. Deputy Tanabe confirmed that the "PI friend" was indeed Butler.

Tanabe went on to tell Howard that they could no longer talk on the phone because they were probably being "bugged". Tanabe went on to tell Howard that the police were going to start investigating him because of the "Dirty DUI's".

Tanabe said that he knew the police were going to be serving a search warrant on his home soon and he was concerned because an item that he possessed was going to be found during the search warrant of his residence. Tanabe asked if he could leave something at Howard's home until things settled down. Tanabe also told Howard that he had already instructed his wife on how to act when police served the warrant. Tanabe said that he felt when police served the warrant they would kill his dog to punish him.

Howard agreed to take the item. Tanabe went out to his vehicle and grabbed an item covered with a black plastic garbage bag. Tanabe asked that Howard place the item in his attic to keep it hidden. Deputy Howard said that he felt uncomfortable with what Tanabe was asking him to do but he did not want to cause a confrontation so he took the item.

Howard told me that he did not look in the bag and did not know what it contained. Howard said that after a week of having the item and hearing more information about the Wielch and Butler arrests he felt that he might be hiding something illegal. After much thought Howard decided to contact the Sheriff's Office and turn over the item that Tanabe had asked him to hide.

I asked Howard what he knew about Tanabe and Butler's relationship. Howard said that he knew that Tanabe had worked for Butler at his private investigations business, shortly after Tanabe was fired from Antioch Police Department. Howard believed that Butler and Tanabe spoke to each other approximately three to four times a week. Howard also said that Tanabe was recently conducting surveillance for Butler while being employed by the Contra Costa County Sheriff's Department.

On February 23, 2011 at approximately, 1700 hours I went to Howard's residence and retrieved the item in question. Upon inspecting the contents of the black bag I found a Bushmaster AR-15 assault rifle (Model# XM15-E2S Serial # L106686).

On February 24, 2011, I took the rifle to the Contra Costa County Crime Lab. I requested the rifle be processed for fingerprints and the presence of DNA. The rifle was processed for DNA and a DNA sample was present and has been saved awaiting a comparison sample. The rifle was also processed for finger prints with negative results.

Additionally, I had the weapon inspected by Criminalist Eric Collins. Collins is the Sheriff Office weapons expert. Collins determined the rifles barrel length was approximately 10 7/8 inches long and is a short barreled rifle as defined in California Penal Code Section 12020.

In addition, the rifle is a semiautomatic center fire rifle that accepts a detachable magazine, has a pistol grip, telescoping stock, and a flash suppressor, and has an overall length of less than 30 inches. This rifle had a maximum overall length of 29 ¾ inches with the stock fully extended. The rifle is was determined to be an assault weapon as defined in California Penal Code 12276.1. A records check through the ATF determined that the rifle was not registered to Deputy Tanabe and does not qualify as an assault weapon owned and registered before the ban.

On February 28, 2011, I met with District Attorney Investigator Daryl Jackson. Jackson told me that a search of Butler's cell phone confirmed that Tanabe and Butler had made arrangements to have Katz arrested. Additionally, it was discovered that there was information on Butler's cell in regards to a second arrest of Hasan Aksu on January 9, 2011. I conducted a records check and found that Aksu was indeed arrested on January 9, 2011 by Tanabe for driving under the influence of an alcoholic beverage (Sheriff's DR#516). It appears that Aksu was a targeted by Tanabe and Butler based on the text messages.

On March 2, 2011, I conducted an interview with Deputy Tom Henderson of the Contra Costa County Sheriff's Department. Deputy Henderson had information regarding a DUI investigation that he was part of in which he felt Tanabe was acting as an agent of Butler. Deputy Henderson said that he could not remember the suspect's name or which day he conducted the DUI stop. Deputy Henderson does remember receiving a phone call from Tanabe in which Tanabe told him that he was off duty in a bar in the downtown area of Danville and an individual, who was later identified as David Bauldry, was drinking heavily and would be leaving the bar soon.

Tanabe asked Deputy Henderson to conduct a traffic stop for DUI once Bauldry left the bar. Tanabe went on to explain to Henderson that Bauldry was being targeted because Bauldry was cheating on his wife and they (Butler and Tanabe) wanted to "Dirty him up" for a future court case. Tanabe provided a description of Bauldry's vehicle and told Deputy Henderson that he was leaving the bar. Deputy Henderson parked on a side street and watched the vehicle drive by. Deputy Henderson visual estimated the vehicle was traveling approximately 35 mph in a 25 mph zone. Deputy Henderson activated his radar and got a reading of 35 mph. Deputy Henderson conducted a traffic enforcement stop for CVC 22350.

Deputy Henderson told me that once he stopped the vehicle he asked Deputy Robert Durrer to conduct the DUI investigation. Deputy Durrer determined that Bauldry was under the influence of an alcoholic beverage and arrested him for CVC 23152 (A). Through my investigation I was able to determine that the arrest in question occurred on November 2, 2010, Sheriff's DR#10-20314.

After reviewing the text messages taken from Butlers cell phone. On January 22, 2011 at approximately 1815 hours, Butler wrote Tanabe a text message that read as follows "Steve, can you get an update on the DUI case involving David Lane Bauldry."

On March 3, 2011, I met with Jackson to discuss the DUI stop of Katz. Jackson told me that upon investigation of Butler's records, it appears that Katz's wife paid Butler approximately five thousand dollars to conduct an investigation into her husband.

I was able to confirm Tanabe's place of residence through his personnel records kept by the Sheriff's Office. I could not check Tanabe's DMV record for his listed address due to Tanabe having access to Sheriff's Office database. A record of my inquiry into his DMV records could easily be discovered by Tanabe thus jeopardizing the ongoing investigation.

I have reasonable cause to believe that grounds exist for the issuance of a search warrant based on the content of this affidavit which includes the above-referenced attachments, and pray that a search warrant be issued.

☐ The following listed official police reports and records; and documents, exhibits and photographs:

☒ Statement(s) of expertise and opinion:

Through my training and experience and the facts stated in my above probable cause declaration it is my opinion that Tanabe possessed an illegal assault rifle as defined by Penal Code sections 12020 and 12276.1. It is my belief that Tanabe took the rifle to Howard's residence to avoid it being discovered during a search warrant he felt was forth coming due to his participation of "Dirty DUI" arrests in which he had been acting as an agent for Butler. I am requesting a search warrant be issued for Tanabe's DNA to confirm the sample DNA taken from the seized rifle. It is my opinion that the DNA samples taken from the rifle will match the samples taken from Tanabe.

I am also asking that a search of Tanabe's residence be authorized for additional illegal firearms/weapons. Through my training and experience I have found that those who possess illegal firearms/weapon tend to own additional illegal firearms/weapons. These items are quite often concealed in the residence of the individual in question. I believe a search of Deputy Tanabe's residence will yield additional illegal firearms/weapons.

It is my opinion that Deputy Tanabe has abused his police powers and has been acting as an agent of Butler while on duty as an Officer of the City of Danville. I am asking a search warrant for Deputy Tanabe's cell phone and computer and any other electronic storage device be issued. It is my belief that a search of these items will result in additional information confirming that Deputy Tanabe and Butler have conspired to set up other individuals to be arrested for driving under the influence of an alcoholic beverage. I believe that Deputy Tanabe and/or Butler are receiving financial benefits from clients of Butler's private investigation business by creating a situation in which the target will be entrapped and will inevitably become a victim of a "Dirty DUI" vehicle stop.

I certify (or declare) under penalty of perjury under the laws of the State of California that the information in this Affidavit is true and correct:

_____          _____
            Affiant                                            Affiant

Subscribed to and sworn before me this _4th_ day of _March, 2011_

1115? AM - PM

_____ Judge of the Superior Court of Contra Costa County

RICHARD E. ARNASON

<u>Statement of Expertise and Training</u>
Sergeant Detective Jason Vorhauer

I, Jason Vorhauer, have been employed as a Peace Office with the Contra Costa County Sheriff's Office for over 10 years. I am currently assigned as a Sergeant assigned to the General Investigations Unit with the Contra Costa County Office of the Sheriff.

**Formal Specialized Training:**

- 789 hours of Basic Police Academy at the Los Medanos College Police Academy
- Interview and Interrogation : 40 Hours
- Basic S.W.A.T. school : 80 Hours
- Robbery Investigation: 40 Hours
- Search Warrant : 8 Hours
- Incident Response to Terrorist Bombings: 32 Hours
- Narcotic's Investigation School: 80 Hours
- Supervisory Core Course: 80 Hours
- Officer Involved Shooting Course: 40 Hours

**Practical Experience**

- Search Warrant experience: I have been involved in the service and execution of numerous search warrants. I have investigated numerous felony crimes including property, persons and narcotic crimes.
- Interviews with known Burglars: I have interviewed numerous admitted burglars about their reasons and means of burglarizing residences, commercial buildings, automobiles, and other places.
- Interviews with known drug users and sellers: I have interviewed and/or been involved in the interview of numerous admitted drug users and sellers about the use and sales of illegal drugs.
- I have made, investigated or assisted in numerous arrests for various crimes against persons to include: Murder, Attempted Murder, Assault with a Deadly Weapon, Battery, Criminal Threats, Domestic Violence, Possession of a Deadly Weapon, Robbery, and Shooting into an Inhabited Dwelling.
- I have made, investigated or assisted in numerous arrests for various theft and fraud crimes to include.; Burglary, Grand Theft, Petty Theft, Robbery, Identity Theft, Credit Card Fraud, and Forgery.
- I have made or assisted in numerous arrests for various narcotics to include: Methamphetamines, Marijuana, Hash, Hash oil, Cocaine, and Ecstasy.
- I have made or assisted in numerous arrests for sales of narcotics and street level, hand to hand, drug sales.
- I have made or assisted in numerous arrests in the cultivation of marijuana for sales.